## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| MATTHEW AUBLE, JOSEPH ALTERMAN, DON BILYEU, LEO CRITCHFIELD, MICHAEL CROTEAU, LUCY AND ANDREW HALLBERG, MICHAEL O'NEAL, DANIEL PEABODY, GARY PFEIFFER, COLLIN REESE, JIM RIEBER, MATTHEW THOMPSON, and GUSTAV VANZYL, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br>v.<br><br>WINNEBAGO INDUSTRIES, INC. and GRAND DESIGN RV, LLC,<br><br>      Defendants. | **Civil Action No.: 3:25-cv-00240-DRL-SJF**<br><br>**AMENDED COMPLAINT FOR DAMAGES**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Matthew Auble, Joseph Alterman, Don Bilyeu, Leo Critchfield, Michael Croteau, Lucy and Andrew Hallberg, Michael O'Neal, Daniel Peabody, Gary Pfeiffer, Collin Reese, Jim Rieber, Matthew Thompson, and Gustav Vanzyl ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action complaint against Defendants Winnebago Industries Inc. and Grand Design RV, LLC ("Defendants"). On personal knowledge of their own circumstances and upon investigation and information and belief of their counsel, Plaintiffs allege the following:

## NATURE OF THIS ACTION

1.     Since at least 2020, Winnebago Industries Inc. ("Winnebago") and Grand Design RV, LLC ("Grand Design") knowingly deceived their customers, distributed thousands of defective recreational vehicles ("RVs"), and devised a scheme to cover up the truth: Grand Design RVs are not safe for the road.

2.     As part of this scheme, Defendants crafted targeted marketing campaigns that preyed on Americans' dreams of starting a new life on the road and exploring the country safely in one of their very own Grand Design RVs, all in the midst of the once-in-a-century COVID

pandemic.

3.      However, unbeknownst to Plaintiff and members of the classes, this dream would soon become a nightmare; the frame that was designed and installed on model year 2020-2023 Grand Design RVs was defective and not sufficiently capable of tolerating the weight and stress of typical RV use, diminishing the value of each RV it sold by at least tens of thousands of dollars and often rendering the RVs unusable and and/or uninhabitable.

4.      Instead of fixing the problem, Defendants continued selling.

5.      Instead of issuing a recall, Defendants initiated a cover up.

6.      And instead of protecting their customers, Defendants prioritized profit, using NDAs, misleading public statements, and online censorship to counter complaints about frame failure.

7.      As a result, Defendants generated (and reaped the profits of) hundreds of millions in RV sales, all while leaving their customers, including Plaintiffs, to deal with the literal and figurative wreckage.

8.      This lawsuit seeks to stop Defendants' illegal and deceptive profiteering, and to provide Plaintiffs—and thousands like them—the fairness and justice they deserve.

## **PARTIES**

9.      Plaintiff Matthew Auble resides in Arizona, as he did at all relevant times during the conduct alleged in this Complaint.

10.     Plaintiff Joseph Alterman resides in Florida, as he did at all relevant times during the conduct alleged in this Complaint.

11.     Plaintiff Don Bilyeu resides in Oregon, as he did at all relevant times during the conduct alleged in this Complaint.

12.     Plaintiff Leo Critchfield resides in California, as he did at all relevant times during the conduct alleged in this Complaint.

13.     Plaintiff Michael Croteau resides in New Hampshire, as he did at all relevant times during the conduct alleged in this Complaint.

14.     Plaintiffs Andrew and Lucy Hallberg reside in Georgia, as they did at all relevant times during the conduct alleged in this Complaint.

15.     Michael O'Neal resides in Ohio, as he did at all relevant times during the conduct alleged in this Complaint.

16.     Plaintiff Daniel Peabody resides in Florida, where he intends to remain as a resident. At the time he purchased the RV that is the subject of this Complaint, Plaintiff Peabody resided in Arizona.

17.     Plaintiff Gary Pfeiffer resides in Illinois, as he did at all relevant times during the conduct alleged in this Complaint.

18.     Plaintiff Collin Reese resides in Colorado, as he did at all relevant times during the conduct alleged in this Complaint.

19.     Plaintiff Jim Rieber resides in Minnesota, as he did at all relevant times during the conduct alleged in this Complaint.

20.     Plaintiff Matthew Thompson resides in California, as he did at all relevant times during the conduct alleged in this Complaint.

21.     Plaintiff Gustav Vanzyl resides in Idaho, where he intends to remain as a resident. At the time he purchased the RV that is the subject of this Complaint, Plaintiff Vanzyl resided in California.

22.     Defendant Winnebago Industries Inc. ("Winnebago") is a corporation existing under the laws of Minnesota with a principal place of business located in Eden Prairie, Minnesota. At all times relevant to this Complaint, Winnebago has transacted business in this District and throughout the United States.

23.     Defendant Grand Design RV, LLC ("Grand Design") is a limited liability company existing under the laws of Indiana, with its principal place of business in Middlebury, Indiana. At all times relevant to this Complaint, Grand Design has transacted business in this District and throughout the United States.

<u>**VENUE AND JURISDICTION**</u>

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' and the Class Members' claims occurred in this District, and Defendants are subject to the Court's personal jurisdiction.

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) and (d)(2) because this action is a class action in which the matter in controversy exceeds $5,000,000 exclusive of interest and costs, and members of the putative classes are citizens of states that are different from the states of which Defendants are citizens.

26.     This Court has personal jurisdiction over Defendants because Defendant Grand Design has its principal place of business in Indiana. Defendant Winnebago has contacts with the State of Indiana that are so continuous and systematic that it is essentially at home in this State. Moreover, Defendant Winnebago has purposefully availed itself of the benefits of transacting business in Indiana, has placed its goods into the stream of commerce through its acts and contacts in Indiana, and Plaintiffs' claims arise out of or relate to Winnebago's connections to Indiana.

27.     Indeed, Indiana is widely regarded as the "RV capital of the world" – a fact that is acknowledged by both Grand Design[1] and Winnebago[2] on their consumer-facing websites, as well as Elkhart County, Indiana's public tourism webpage that, among other things, lists available RV factory tours of Winnebago Industries Towable located at 11756 County Road 14, Middlebury, Indiana 46540 and Grand Design RV located at 11333 County Road 2, Middlebury, Indiana 46540.[3]

28.     This Court's exercise of personal jurisdiction over Defendants is in accordance with Indiana Trial Rule 4.4, because both Grand Design and Winnebago have submitted to the jurisdiction of the courts of Indiana by doing and soliciting business in Indiana, providing products

---

[1] GRAND DESIGN, *The Annual Grand Design National Rally*, (last visited June 11, 2025), available at https://www.granddesignrv.com/owners/grand-design---national-rally

[2] WINNEBAGO, *A Visit to the RV/MH Hall of Fame in Indiana*, (last visited June 11, 2025), available at https://www.winnebago.com/lifestyle/winnebagolife/travel/a-visit-to-the-rv-mh-hall-of-fame-in-indiana

[3] https://www.visitelkhartcounty.com/listing/winnebago-industries-towable/298/; https://www.visitelkhartcounty.com/listing/grand-design-rv/908/

and/or services by or to persons in Indiana, and deriving substantial revenue from goods sold in Indiana, and because the exercise of jurisdiction over these Defendants does not offend traditional notions of fair play and substantial justice.

29.     Grand Design is a wholly owned subsidiary of Winnebago and, at all times relevant to this Complaint, Winnebago exercised complete control over Grand Design's decision-making and operations.

30.     Since at least November 2016, Donald Clark, co-founder of Grand Design, has served as an executive officer at Winnebago and as President and CEO of Grand Design.[4] In 2019, Mr. Clark became Vice President of Winnebago while simultaneously continuing to serve as President and CEO of Grand Design. Winnebago pays Mr. Clark's salary, as well as quarterly and annual bonuses for his work with Grand Design.

31.     For several years, upper-level personnel have rotated between management and executive level positions at both Winnebago and Grand Design, demonstrating the close integration between Winnebago and its wholly owned subsidiary.

32.     Winnebago and Grand Design are joint beneficiaries of loan agreements with major company creditors.

33.     Grand Design employees' retirement and 401(k) Plans are funded and paid for entirely by Winnebago.

34.     Winnebago Industry's Fiscal Year 2025 Second Quarter Earnings Presentation consistently conflates Grand Design's operations, sales, and profits with its own. For example, Winnebago displays its Q2 net revenues from its Towable RV Segment on a slide that promotes an image of a Grand Design Influence RV – one of the defective models at issue in this litigation.[5] Winnebago also states that its Grand Design Lineage "[r]epresents a $100M-plus revenue

---

[4]

https://www.sec.gov/Archives/edgar/data/107687/000010768716000120/exh109clarkemploymentagree.htm

[5] https://winnebago.gcs-web.com/static-files/dd3f4e87-9b42-4fe3-bc5a-e01be17d1cc1 at slide 9.

opportunity in FY25" for Winnebago.[6]

35.    Moreover, slides showing Winnebago's "North America RV Market Share Performance" conflate Grand Design's contributions as Winnebago's own overall growth in the Towable RV market segment, such as by removing all reference to Grand Design existence as a separate entity starting in fiscal year 22.[7] In other words, all growth attributable to Grand Design was characterized as Winnebago's growth.

36.    Winnebago's Fiscal Year 2025 Second Quarter Investor Presentation further exemplifies Winnebago's understanding that it maintains continuous and systematic contacts with Indiana (and specifically within the Northern District). On slide three, which provides an "Overview" of the "locations" of its operations, Winnebago explicitly confirms that its "RV Production" occurs only in Indiana and Iowa.[8]



*Winnebago's Locations, Fiscal Year 2025 Second Quarter Investor Presentation*

---

[6] https://winnebago.gcs-web.com/static-files/dd3f4e87-9b42-4fe3-bc5a-e01be17d1cc1 at slide 4.

[7] https://winnebago.gcs-web.com/static-files/dd3f4e87-9b42-4fe3-bc5a-e01be17d1cc1 at slide 6.

[8] *See* https://winnebago.gcs-web.com/static-files/21bf0b32-2cdc-4f26-bfd1-5390a595d06f at slide 3 (neither party argues or believes that Iowa is a more appropriate venue, especially since the RVs at issue are produced within Indina).

37.     On its website, Winnebago promotes both salaried and hourly employment positions at its locations in Indiana, such as "Senior Accountant"; "Production Worker"; "Service Technician"; "Engineering Director"' and "Maintenance Manager."[9]

38.     Moreover, Winnebago's website directs consumers to purchase its Grand Design RVs.[10]

39.     In short, Winnebago and Grand Design function as a single company, financially integrated with shared executives. Winnebago tells investors that Grand Design is one of its profitable "brands," calls it a valuable "trademark," and lists Grand Design as one of its "eight operating segments" in filings with the SEC.

40.     Winnebago also has independent and systematic contacts with Indiana in relation to its sales of RVs, including RVs sold under its Grand Design brand.

41.     On the "contact us" page of Winnebago's website, the section about Towable RVs—the type of product at issue—lists Winnebago's mailing address as 201 14th Street, Middlebury, Indiana 46540.[11]

42.     On its LinkedIn page, Winnebago Industries states that it has facilities in Indiana.[12] Winnebago also has at least seven authorized RV dealers located throughout Indiana and listed on its website.[13] These dealers routinely conduct RV repairs, including attempting to repair excessive frame flex on Winnebago's Grand Design branded RVs.

43.     Thus, both Grand Design and Winnebago maintain systematic and continuous contacts with the state of Indiana, including contacts out of which these claims arise or relate to.

---

[9] https://www.winnebago.com/careers/towables

[10] https://www.winnebagoind.com/brands/grand-design-rv

[11] Winnebago, *Contact Us: Winnebago Towables*, (last visited June 11, 2025), available at https://www.winnebago.com/contact-us.

[12] LinkedIn https://www.linkedin.com/company/winnebago-industries/about/

[13]https://www.winnebago.com/shopping-tools/dealer-directory/us/indiana?selectedState=Indiana&vehicleType=Motorhomes&Group=81&Motorhomes=True&Towables=False

## FACTUAL BACKGROUND

I.    **The RV Industry and Defendants' Place Within It**

A.    **The RV Industry**

44.    The modern RV traces its history back to August 1915, coinciding with the rise in popularity of camping in the early twentieth century.

45.    The first RV, described then by the New York Times as a vehicle with "the power of motion and . . . a dwelling place fit for a Caliph," was quickly seen as a necessity for those desiring "to escape modern life's pressures by traveling into nature" without forsaking the "comforts of modern life."[14]

46.    As the RV gained popularity in the mid-twentieth century, several companies sought to meet this demand, producing everything from drivable motorhomes to "towable" campers.

47.    By the late twentieth century, RVs were a muti-billion-dollar industry.

48.    Manufacturers began producing a variety of different RV types, the most common being motorhomes, fifth wheels, and other towables.

49.    Motorhomes are built on a bus or commercial truck chassis and range from anywhere to 17 to 45 feet in length. Motorhomes are the largest and most expensive class of RV.

50.    A fifth wheel is a towable unit that is hitched to the truck bed of a towing vehicle. They can run over 30 feet in length with multiple slide outs, which typically afford a larger interior than motorhomes.

---

[14] https://www.smithsonianmag.com/innovation/brief-history-rv-180970195/.



*Towable "fifth wheel" RV – Brinkley RV Model Z3100.*[15]

51.    Other towables are typically smaller in size, are attached to a vehicle's tow hitch, and come in a variety of forms, from "casual campers," to "toy haulers," to "teardrop trailers."

52.    Over time, consumers looking to live full or part-time in their RVs favored fifth wheels over other RV options. This was, in part, because fifth wheels offered more usable living and storage space and were easier to tow using a pick-up truck.

53.    As a result, fifth wheels were manufactured to be taller and longer than other travel trailers. And, as pick-up trucks were designed to pull heavier weights with ease, the weight of fifth wheels increased in tandem. Thus, while the average fifth wheel in the 1990s weighed approximately 7,000 to 7,500 pounds, the average fifth wheel today typically exceeds 11,000 pounds. Grand Design's most popular towable RVs often exceed 15,000 pounds.

54.    This drive to put larger and heavier RVs on the road has not been impeded by state or federal regulations.

55.    Although motorized vehicles are regulated by multiple governmental agencies, towable RVs do not fall within these agencies' regulatory purview. Amid this regulatory vacuum, the RV industry's trade association and lobbying arm—the Recreational Vehicle Industry Association ("RVIA")—publicly claimed to act as a regulatory body.

56.    The RVIA, however, has no regulatory authority.

57.    Against this background, manufacturers of motorhomes and fifth wheels compete with one another to produce the largest, most luxurious RVs possible.

---

[15] https://wildrvlife.com/blog/brinkley-rv-review/

**B.    Grand Design**

58.    Grand Design was founded in 2012 in Middlebury, Indiana.

59.    The company quickly became one of the fastest growing RV brands in the industry, with an annual growth rate over 80 percent between 2013 and 2016.

60.    This growth was driven in part by its popular line of towable, supersized fifth wheels. Grand Design marketed its various models, including the Solitude, Influence, Reflection, and Momentum, to customers who "prioritize stability for long distance travel" and were "in it for . . . the long stay."[16]

61.    While the Solitude, Influence, Momentum, and Reflection vary in size and levels of luxury, despite these cosmetic differences, all Grand Design towable RVs have the same basic structure and functionality, and all are situated atop the same type frame, designed by the same company, Grand Design, and same company, Lippert.

62.    In the beginning, Grand Design built customer loyalty through its unique approach to safety. Unlike its competitors, which often prioritized the quantity of vehicles sold over their quality, Grand Design focused on providing higher quality RVs and customer service than its competitors.

63.    Grand Design also pioneered a "unique pre-inspection process to ensure [that] defects [were] minimized."[17] This pre-inspection process was burdensome and time consuming.

64.    As described by Grand Design's long-time CEO, Donald Clark, this process, unlike any other in the RV industry, first required workers to "scour the vehicles for defects multiple times."[18]

65.    If the RV passed these initial inspections, it was then transported to another "pre-

---

[16] https://www.granddesignrv.com/adventure-more/learn/which-grand-design-model-is-right-for-you.

[17] https://www.southbendtribune.com/story/business/2016/05/08/grand-design-rv-breaks-ground-on-11-million-project-creating-100-jobs/46623669/

[18] *Id.*

10

inspection facility," where "every unit" underwent another "198-point inspection" before it was transported to dealers.[19]

66.    The company explained the purpose of this process publicly, emphasizing that "Paranoia is a pretty powerful motivator for us, . . . We don't want to disappoint our dealers, retailers[,] and customers."[20]

67.    With this meticulous attention to detail and initial commitment to safety, Grand Design earned a stellar reputation in RV communities across America.

68.    As a result, within just four years of its founding, Grand Design experienced unprecedented annual growth, generating over $428 million in revenue in the twelve months ending August 2016, and in October 2016, the company was acquired by Winnebago.

**C.    Winnebago and its Acquisition of Grand Design**

69.    Founded in 1958 in Winnebago County, Wisconsin, Winnebago quickly became the "the No. 1 manufacturer of travel trailers and motor homes."[21]

70.    By 2004, "Winnebago's annual sales exceeded $1 billion, and [the company] was recognized as the 'most-admired RV manufacturer' by RVBusiness magazine."[22] And in an attempt to further increase its share of the RV towables market, Winnebago acquired Grand Design in an unprecedented $500 million deal.[23]

71.    However, with new management came new priorities. Where pre-acquisition Grand Design operated with a steadfast focus on safety and customer service, under Winnebago's control, its new focus was on maximizing profits. This became painfully clear during the COVID-19 pandemic.

---

[19] *Id.*

[20] *Id.*

[21]    https://www.winnebago.com/lifestyle/winnebagolife/showroom/winnebago-milestones-pioneering-for-65-years.

[22] *Id.*

[23] *Id.*

## II.    Grand Design, Under Winnebago's Direction and Control, Manufactures and Markets RVs with Defective Frames

### A.    Grand Design Uses the Pandemic to Supercharge Sales with Marketing Deception

72.    In 2020, as most of the world fought to contain the COVID-19 virus, some companies sought to benefit from the changed business environment, including Winnebago and Grand Design.

73.    The COVID pandemic saw a general increase in RV interest, driven by the fact that RVs allowed people to escape crowded cities and get outdoors, while keeping the comforts of home.

74.    And Defendants went above and beyond to capitalize on that interest, using a litany of marketing ploys to target customers who wanted to purchase an RV for full-time use, and what would essentially become their new home.

75.    For example, Grand Design's content manager, Thomas Gropp III, said in a public post: "If this pandemic has taught us anything, it's that life is too short to be bound to one place forever." He urged potential customers to see the silver lining of pandemic restrictions, which "have made touring the country in an RV . . . an extremely attractive option for those of us who want to get away on the weekends – or be nomadic full-time."[24] Gropp further assured potential customers that RVs are the best option for this "nomadic" lifestyle, claiming that "RVs require less maintenance than campervans," and that "[a]n RV might save your relationship. A campervan may end it."[25]

76.    At the time, Grand Design's website, brochures, and other channels of

---

[24] *See* Gropp, T., *RV or Van-Life?: Why an RV Might Be a Better Better Fit than a Campervan,* *http://web.archive.org/web/20230204162515/https://gdrv4life.granddesignrv.com/rv-lifestyle/rv-or-van-life-why-rv-might-be-better-fit-campervan* (last accessed on January 30, 2025). https://gdrv4life.granddesignrv.com/rv-lifestyle/rv-or-van-life-why-rv-might-be-better-fit-campervan

[25] *Id.*

communication echoed these sentiments, advertising its RVs as "The Cure for Full-Time Living" and offering "Full Time Living: With You for the Long Haul."[26]

77.     Grand Design's direct communications to customers made similar promises of quality, safety, and care.

78.     Its brochures promised customers that Grand Design RVs are "Quality driven. Customer focused. Built to last."[27]

79.     For example, in its Solitude RV brochure, Grand Design claims, "With quality at the foundation of everything we do, we do more. We pay attention to detail, we focus more on our customers, we perform more vigorous inspections."[28]

80.     Likewise, in its Momentum RV brochure, Grand Design promises customers: "you're investing in a lifestyle of unparalleled quality and convenience."[29]

81.     Brochures for the Reflection and Influence contain materially the same representations regarding quality.[30]

82.     Grand Design's website provides further assurances about quality, safety, and care. Information pages for the Solitude, Momentum, Reflection, and Influence models represent that these RVs are "constructed to a superior standard."[31]

---

[26] https://hntrbrk.com/winnebago/

[27] Grand Design, Transcend Brochure (last accessed September 14, 2024), https://www.granddesignrv.com/shopping-tools/brochures/brochure-download

[28] Grand Design, *Solitude Brochure* (last accessed September 14, 2024), https://www.granddesignrv.com/shopping-tools/brochures/brochure-download

[29] *See* Grand Design, *Momentum Brochure* (last accessed September 14, 2024), file:///Users/emmadietz/Downloads/Momentum%20Brochure.pdf

[30] *See* https://www.granddesignrv.com/shopping-tools/brochures/brochure-download

[31] https://www.granddesignrv.com/fifth-wheels/solitude?modelName=Solitude; https://www.granddesignrv.com/fifth-wheels/influence?modelName=Influence#brand-construction-item-5d0f193fd8-tab;https://www.granddesignrv.com/toy-haulers/momentum-g-class-travel-trailers?modelName=momentum-g-class-travel-trailers; https://www.granddesignrv.com/fifth-wheels/reflection#:~:text=Constructed%20to%20a%20Superior%20Standard&text=Grand%20D (footnote continued)

83.    Further, Grand Design recognized that its RVs must be, and assured customers that its RVs were, designed to withstand the environmental pressures attendant with their intended use: "anything built by humans that travels down the open road is subject to issues, but it's how those issues are addressed that make Grand Design stand out." The website added, "We take care of our customers after the sale. An informed customer will be a Grand Design customer."[32]

84.    Advertisements posted on YouTube and other social media channels similarly promised customers "more attention to detail, more experienced Craftsmen, more rigorous inspections, more focus on the customer . . . at Grand Design RV, we do more of what matters."[33]

85.    For its part, Grand Design's parent Winnebago made similar representations, promising the highest quality and safety of all of its RVs and assuring customers that it would: "Do the right thing," "Operate with integrity and trust," "Take ownership & be accountable," "Put people first," and "Focus on safety – always."[34]

86.    Moreover, since at least 2020, Winnebago has published an annual Corporate Responsibility Report, in which it has represented to customers and potential customers that it prioritizes safety and ensures its RVs operate safely.[35]

---

esign%20goes%20the%20extra,bottom%20of%20the%20front%20cap.&text=A%20layer%20of%20fiberglass%20insulation,full%20length%20of%20the%20roof.&text=A%20layer%20of%20fiberglass%20insulation%20under%20the%20gooseneck,place%20often%20forgotten%20by%20others.&text=Rigid%20Foam%20insulation%20lines%20the%20inside%20of%20our%20heavy%20duty%20baggage%20doors.

[32] Grand Design RV, "Our Story," available at https://www.granddesignrv.com/our-story (last visited April 26, 2021).

[33] https://www.youtube.com/watch?v=T8gQNOhG-fc

[34] https://www.winnebagoind.com/about-us

[35] *See* 2020 Corporate Responsibility Report at 19 (promising "uncompromising safety, quality and innovation"), available at https://winnebago.gcs-web.com/static-files/8a21aa63-fb49-4f57-9b57-9aa01a36f6f1?_gl=1*u3duv8*_gcl_au*NjA2MDY0OTk4LjE3MjY1MTAzMjA.*_ga*NTgxMjI0NzQ3LjE3MjY1MTAzMjA.*_ga_0MCLKH5P7Q*MTcyNjg2MDAyNC4zLjEuMTcyNjg2MTc3My42MC4wLjA.; 2021 Corporate Responsibility Report at 10 (representing that "safety is (footnote continued)

87.     Grand Design also took steps to position itself as a lifestyle brand by paying social media influencers—dubbed "Grand Design Ambassadors"—to act as company representatives and both market to and engage with potential customers on YouTube, Instagram, and other social media platforms about the benefits of buying a Grand Design RV.

 

Left: *Matt's RV Reviews, "WORLD DEBUT - ALL New Grand Design Influence!"*[36]
Right: *Screenshot of Mylesrvs tour of Grand Design Solitude shared on Instagram..*

paramount"), available at https://winnebago.gcs-web.com/static-files/aa64252a-1236-4e48-a256-18767082e5a6?_gl=1*vrntur*_gcl_au*NjA2MDY0OTk4LjE3MjY1MTAzMjA.*_ga*NTgxMjI0NzQ3LjE3MjY1MTAzMjA.*_ga_0MCLKH5P7Q*MTcyNjg2MDAyNC4zLjEuMTcyNjg2MTE0Ni41Ni4wLjA; 2022 Corporate Responsibility Report at 13 (representing that Winnebago assigns personnel "dedicated to enterprise product safety and compliance to accelerate and enhance the safety of our products"), available at https://winnebago.gcs-web.com/static-files/f56fa871-e0f3-43ee-bd8d-c023eed60d9c?_gl=1*1rhyfnc*_gcl_au*NjA2MDY0OTk4LjE3MjY1MTAzMjA.*_ga*NTgxMjI0NzQ3LjE3MjY1MTAzMjA.*_ga_0MCLKH5P7Q*MTcyNjg2MDAyNC4zLjEuMTcyNjg2MDUwMi40Ni4wLjA; 2023 Corporate Responsibility Report at 19 (assuring that Winnebago "upholds    the    highest    standards    of    safety    in    our    products"),    available    at https://www.winnebagoind.com/our-impact#carousel-a7e9447843-item-2812c9a857-tabpanel.

[36] https://www.youtube.com/watch?v=UrZU88hspUU

88.     Through the "Grand Design Ambassador" marketing tactic, Grand Design told customers that they could "live the life of luxury"[37] on the open road. These company ambassadors staged virtual tours for potential buyers, showing off their motor home's substantial storage areas, spacious kitchens, high-ceiling showers, sizable bedrooms, and even gas-powered fireplaces.

89.     In one such virtual tour, a Grand Design employee told potential buyers, "as we all know, this is like a house on wheels. It's going through earthquake and hurricane type conditions. You need some kind of support. So we take this into consideration."[38]

90.     Customers said that Grand Design "sold [them] the dream."[39]

91.     And Defendants understood exactly what they were selling. They knew that Purchasing an RV was no small decision, requiring significant expenditure, and representing an investment in the customer's desire for freedom to travel where and when they wanted in luxury.

92.     Defendants knew that potential buyers, faced with the decision to invest in a Grand Design RV, would carefully review information available from its company website, information shared on other websites, blogs, brochures, social media, Grand Design Ambassador videos, and other promotional material channels.

93.     And so, Grand Design repeatedly promised, through its myriad channels of communication, that its towables were uniquely safe for the road and built using "superior construction standards. [40] And that dream of owning an RV comes with a sizable price tag. Most

---

[37] *See* ChangingLanes, *Grand Design Momentum 410TH RV Home Tour* at 3:01, https://www.youtube.com/watch?v=4IocG9Fj1kY

[38] https://www.youtube.com/watch?v=FaPoB9W2Mc8 at 5:03 – 5:10.

[39] https://hntrbrk.com/winnebago/

[40] For example, the web pages for the Reflection, Momentum, Solitude and Influence all boast that the units include features such as fully laminated walls, a double insulated roof, and double insulated floors. None of the "construction" tabs include any information about the RV frame. See https://www.granddesignrv.com/fifth-wheels/influence?modelName=Influence; https://www.granddesignrv.com/fifth-wheels/solitude; https://www.granddesignrv.com/toy-haulers/momentum-mav?modelName=momentum-mav#brand-tabs-item-68605351a9-tab; https://www.granddesignrv.com/fifth-wheels/reflection

of Grand Design's RV models cost upwards of $100,000. For the largest sizes, the cost was closer to $150,000.

94.    Many of Grand Design's customers took out large loans to cover the cost of their new home. Others spent a sizable portion of their retirement or life savings.

95.    But unfortunately for these customers, it turned out that Grand Design's promises of quality and luxury were lies.

96.    Moreover, Grand Design's online marketing failed to disclose any information about the structural frames underlying the RV—an omission that concealed critical defects. Uniformly, Grand Design RV frames are not only under-designed to bear the weight of the unit atop them, but were also increasingly assembled with missing or undersized lag bolts and other quality compromises made in the interest of lowering construction costs.

97.    Defendants' failure to disclose the insidious and material defect of frame failure, coupled with their deliberate efforts to obscure or hide the issue, renders their affirmative representations about the RVs' quality, safety, durability, and value false and misleading.

**B.    Defendants Compromise on Quality While Seeking to Capitalize on Surging Demand**

98.    As demand for RVs surged, the pandemic also caused widespread supply chain shortages. RVIA spokesperson Monika Geraci explained that "[t]he best way to describe the supply chain issues has been a game of whack-a-mole." Manufacturers and suppliers had to



"overcome" shipping delays, material shortages and a limited workforce, by "finding different suppliers or swapping things out."[41]

99.    As part of its efforts to meet the surging demand for RVs in the face of these supply chain issues and labor shortages, Winnebago and Grand Design cut corners on quality and design.

100.    The ensuing years were chaos for Defendants' employees, who observed that Defendants' focus on maximizing revenue meant they went from making 16 RVs per day to 36 RVs per day.[42]

101.    Workers in the Grand Design manufacturing facilities described their work as "literally running everywhere all day" and "going as fast as you can possibly work" to keep up with the demand.[43]

102.    As a result, in 2021, Defendants reported record numbers, with Winnebago's deliveries and revenue of towable RVs growing by 48% and 64%, respectively.

103.    The majority of Winnebago's 2021 RV sales were Grand Design-branded towables.

104.    But Defendants' focus on maximizing profits caused it to compromise the safety standards that Grand Design has pioneered.

105.    And to that end, by 2022, Grand Design was producing approximately 1500% more RVs than it had before Winnebago took over, rendering impossible its much-heralded inspection process, which customers had come to trust and rely on.

106.    One of Grand Design's founders, Bill Fenech, has excoriated Winnebago's push to keep up with demand at the expenses of quality at this time, observing that RV manufacturers "made a bad mistake, they overbuilt, and they screwed themselves . . . I saw it coming, I spoke to key leaders whenever I could . . . not that I knew stuff others didn't, but I wanted them to not do

---

[41] RV Industry Association reports best shipment year on record, wvpe.org/wvpe-news/2022-01-25/rv-industry-association-reports-best-shipment-year-on-record.

[42] *Id.*

[43] *Id.*

what they did."[44]

107.    But Defendants failed to heed Mr. Fenech's warnings. And thousands of customers across the country are now suffering the consequences of their corporate greed.

### C.    Grand Design RVs are Manufactured with Defective Frames

108.    Grand Design RVs manufactured in at least model years 2020 to 2023—including the Reflection, Influence, Solitude, and Momentum (collectively referred to as "Grand Design RVs")—are plagued by a latent defect in their frame, which often leads to a problem referred to as "frame failure" or "frame flex."[45] That problem occurs when an RV's frame—which is designed to flex and absorb the stress of traveling on the road—flexes beyond its specified parameters, resulting in significant damage to the RV, and potentially endangering the lives of those towing the RV or others on the roadway.

109.    Despite cosmetic differences between the different models, each RV shares this unifying and fundamental defect: the structural frame underlying the unit is inadequately engineered and incapable of safely supporting the RV's weight under normal, advertised, and foreseeable use. This common design defect renders all models inherently unsafe and predisposed to structural failure.

110.    As a result of the underlying frame defect, Grand Design RVs have experienced frame failure at unprecedented rates.

111.    For years, Defendants had exclusive knowledge of this defect but made no attempt to rectify their misrepresentations or the underlying problems in their defective frames.

112.    And over time, the rate of Grand Design RV frame failure began to increase.

113.    This spike was first recognized by the National Highway Transportation Safety Administrator ("NHTSA"), which, in 2020, reported an increase in complaints related to RV

---

[44] Profiles in Leadership with Bill Fenech, tradeonlytoday.com/profiles-in-leadership-video-series/video-profiles-in-leadership-with-bill-fenech (8:20-8:45).

[45] Discovery may reveal additional Grand Design make or model year RVs also afflicted with frame failure and Plaintiffs reserve the right to amend the complaint accordingly.

frames connected to Grand Design towables.

114.    In 2021 and 2022, NHTSA recorded a similar spike in frame complaints.



*National Highway Transportation and Safety Administration Complaints.*[46]

115.    On October 9th, 2024, after receiving at least twenty-three complaints of frame failure in these models, NHTSA opened a formal investigation into reports of frame failure "on model year 2017-2023 Grand Design fifth wheel recreational trailers, models Momentum and Solitude."[47]

116.    Grand Design RV owners reported, in part, that the excessive frame flex "resulted in a cargo or entry door opening while in transit, some with objects lost on roadways."[48]

117.    Six complainants also reported that their RV's slideouts – which allow owners to extend their RV living space while the vehicle is stationary – extended out partially while they were driving.[49] According to Grand Design's owners' manuals for the Solitude and Momentum RVs, if the slideout is not in the closed position while the RV is being towed, it "could result in

---

[46] "Grand Deception" — Winnebago Muzzles Outcry Over Major Problem That Owners Say Makes RVs Dangerous, Untowable, Worthless - HUNTERBROOK (hntrbrk.com)

[47] https://www.nhtsa.gov/?nhtsaId=PE24029

[48] https://www.nhtsa.gov/?nhtsaId=PE24029

[49] *Id.*

serious injury or death."[50]

118.    NHTSA warned that these reported defects "increase the risk of injury or a crash."[51]

119.    Of course, the number of complaints to NHTSA is likely only a small fraction of the true rate of frame failure.

120.    As a result of this significant frame defect, customers now say that their Grand Design RVs have become a "fulltime nightmare."

### 1.    Understanding RV Frames and Frame Failure

121.    The core problem with Grand Design RVs is their defective frame.

122.    Like the foundation of a house, all RVs require a sturdy frame, which is free of defects, and which can support the weight of the structure on top of it.

123.    All RVs are built on a frame, to which, the axle, suspension, and tires are attached, and upon which the living space sits. And while all RV frames are designed to be flexible—allowing the vehicle to absorb impacts and stress inherent to road travel—the frame must also be strong enough to support the weight that sits on top.



*Diagram illustrating component parts of a Towable RV.*[52]

---

[50] See Owner's Manual Solitude RV at 174; Owner's Manul Momentum RV at 178.

[51] https://www.nhtsa.gov/?nhtsaId=PE24029

[52] Komfort RV Trailer Construction – Cliff Schinkel Design

124.    Approximately 70 percent of all frames for RV brands sold in the United States are built by Lippert Components Manufacturing Industries ("Lippert").

125.    But Lippert does not design the frames. Rather, Lippert simply builds the frames according to specifications provided by RV manufacturers like Defendants.

126.    Most manufacturers design the specifications for the frame based on the floorplan of their RV models.

127.    Each model has a "gross vehicle weight rating" that determines how much weight can safely be loaded onto the RV.

128.    The floorplan, which lays out the interior design of the RV, functionally determines how that weight will be distributed across the RV.



*Examples of floor plans for Grand Designs's Momentum (top) and Influence (bottom) RVs.[53]*

---

[53] Momentum | 397THS (granddesignrv.com); Influence | 3804DS (granddesignrv.com)

129.    Therefore, the frame designed for each model of RV must be strong enough to support each RV's weight at all points across the vehicle.[54]

130.    RV manufacturers like Winnebago and Grand Design are responsible for ensuring that the frame specifications sent to Lippert are designed to support the RV's weight, as well as the weight distribution, of the structure that the frame will carry.

131.    According to Lippert, the structure that RV manufacturers build on top of the frame is "super critical to the successful function" of the RV.[55]

132.    Under the direction and control of Winnebago, Grand Design continued to design and manufacture increasingly larger and heavier RVs, without ensuring that the chassis frames were redesigned and/or engineered to support the additional weight and structural demands.  Thus, the frame specifications Grand Design provided to Lippert were inadequate for the RVs' actual load-bearing requirements. Defendants failed to ensure that the frames used in Grand Design RVs could withstand the stresses of normal and foreseeable use.

133.    Indeed, while Grand Design markets its RVs as having enough physical space and storage capacity to live in full-time, they lack the structural integrity to safely support the corresponding weight. This discrepancy misled consumers, including Plaintiffs, who reasonably relied on Grand Design's representations and purchased RVs based on the belief they could safely carry the weight consistent with their size and advertised functionality.

134.    In fact, many customers report that the actual weight of their vehicle, even when completely empty, exceeds the Gross Vehicle Weight Rating.

135.    And many others have received notifications that the pre-purchase GVWR of their RVs has been retroactively reduced, suggesting that Grand Design knew or should have known that the original weight ratings were inaccurate or unsustainable.

---

[54] *See* Video: Lippert Responds to 'Frame Flex' Issue – Part 2 - RVBusiness - Breaking RV Industry News, at 5:30 - 9:30.

[55] https://rvbusiness.com/video-lippert-responds-to-frame-flex-issue-part-2/ Part 1 at 7:15 – 7:40

136.    In effect, customers, including Plaintiffs, are now being told (or otherwise coming to understand) that their RVs are not safe by design.

137.    Customers, including Plaintiffs, are now being told (or otherwise coming to understand) that their RVs are not able to safety support the actual weight of their RV, as originally represented at the time of sale, rendering Defendants' representations about the safety of the Grand Design RVs materially false and misleading.

138.    Customers have also identified substandard design and/or manufacturing practices contributing to the RVs' structural instability, such as lag bolts used to secure the walls of the RV to the frame being inserted into alternating holes, rather than every hole, and lag bolts that appear too short to adequately secure the RV body to the frame, compounding the risk of frame failure under normal use.

139.    As Dustin Simpson, an experienced RV repair technician, explained, Grand Design sold these RVs as "a full-time unit that you and your family can live in, you can work out of it," resulting in people "using them more for more rigorous traveling and full timing."[56] But, unbeknownst to customers, Grand Design was "overselling" the capacity of its vehicles.

140.    One owner of a 2023 Grand Design Momentum that has suffered serious frame failure put it succinctly: "I feel like they sold a lifestyle of being able to … use these larger rigs as homes. And I don't know if the rigs were built to sustain that, or if they tried to jam as much into them as possible to sell and market that idea."[57]

141.    Indeed, Defendants failed to disclose this material defect in their RVs frames across the product line, and instead uniformly misrepresented the quality, safety, and durability of the Grand Design RVs, thereby omitting critical information that would have materially impacted Grand Design customer's purchasing decisions.

142.    When asked about the rise in frame failures on a recent 2024 earnings call, a Lippert

---

[56] https://hntrbrk.com/winnebago/

[57] https://www.youtube.com/watch?v=rownphniqFA

executive singled out Grand Design RVs, denying that Lippert's construction of the frame was a cause of Grand Design's frame failure and stating that the frame failure is due, in part, to the way that Grand Design designs their RVs.

143. On that call, Lippert executives confirmed that Grand Design RVs have had "flex issues over the years."[58]

144. The Lippert executive further stated that frame failure was "especially" prevalent in Grand Design's "heavier units," which he described as "just giant houses moving down the road."[59]

145. As part of its investigation, NHTSA contacted both Grand Design and Lippert about the increasing complaints of frame failure. In its investigation bulletin, the agency noted that Grand Design reported that "the frame flex is only occurring in the upper deck area of the fifth wheel and is resulting in cosmetic defects such as moving sidewalls, damage to cabinets, binding doors, etc. However, Lippert believes that the effects of frame flex may also extend back to the front axle of the trailer."[60]

146. Indeed, according to NHTSA, "while Lippert provides frames for multiple trailer manufacturers, the majority of complaints are for these Grand Design products."[61]

### 2. The "Dreaded Frame Failure"[62]

147. The defect that Grand Design has baked into its frames sometimes leads to frame failure shortly after purchasers begin driving their Grand Design RV. But for others, it may take years before problems emerge.

---

[58] LCI Industries (via Public) / Q1 2024 Earnings Call - Form 8-K (publicnow.com)

[59] https://www.publicnow.com/view/C03A98200884E113D23904F3449D1FF2B8983A34?1715291175

[60] https://www.nhtsa.gov/?nhtsaId=PE24029

[61] https://www.nhtsa.gov/?nhtsaId=PE24029

[62] See Facebook Post from Pete West, September 19, 2024.

148.    Commonly reported warning signs of frame failure include loose bolts, creaky floors, bowing walls, persistent leaks, damage to the roof, spider-cracking on the RV nose, screws pushing up from the flooring, or fixtures that appear to have shifted after the RV is towed.

 

*Early warning signs of frame failure.*
*Left: front cabinetry moving against wall. Right: door side trim shifting out of place.*[63]

149.    While many customers may not initially understand these problems to be signs of a poorly designed frame, once these problems start appearing, the RV is headed down the road toward catastrophic damage.

150.    In its more advanced stages, I-beams may crack or break, and the upper deck may fail, rendering the RV unlivable, not to mention dangerous.

---

[63] Photos from Facebook Post made by a member of Grand Design RVs with Major Issues showing damage to their Solitude RV.

 

*Photos of more advanced symptoms of frame failure. Left: front cap damage on a customer's Solitude RV discovered by a repair shop. Right: interior damage discovered by the repair shop.[64]*

151.    According to independent engineers and RV repair specialists, once an RV's frame fails, the RV is dangerous to operate on the road because the frame is no longer able to support the heavy structure that sits on top of it.

152.    Addressing frame failure can cost customers tens of thousands of dollars,[65] and even then, the underlying frame defect remains, and repairs do not guarantee a long-term solution.

153.    In fact, once the frame fails, repair options can be extremely limited. Many RV dealerships, including authorized Grand Design dealerships, are not equipped to handle frame failure and will refuse to even make an attempt. As a result, Grand Design has advised its

---

[64] Photos from Facebook Post made by a member of Grand Design RVs with Major Issues showing damage to their Solitude RV.

[65] Midlife Detour, *Frame Flex Broken Welds Cracked Walls - Full Time RV Living EP46* https://www.youtube.com/watch?app=desktop&v=tsz00yUG4To#:~:text=I%20am%20told%20today%20the,at%20no%20cost%20to%20you.; see also https://www.keystoneforums.com/forums/showthread.php?t=40039

customers to take their RV to Grand Design's lone service center, located in Middlebury, Indiana.

154.    But in many cases, because a Grand Design RV with frame failure is not safe to haul to Indiana, these RV owners effectively have no recourse.

155.    Even if such travel is possible, customers are often forced to wait months for an appointment with the Grand Design service center because frame problems are so pervasive. And once there, it can take weeks or even months for Grand Design technicians to diagnose and repair the frame failure.

156.    For many full-time RV owners—the very demographic to which Grand Design targets its marketing—frame failure leaves these customers immobile, and in many cases, unhoused for weeks or months at a time.

157.    In some cases, Grand Design will send a Special Repair Team (SRT) to a customer's location to inspect the RV for damage. However, numerous customers have reported that the SRT conducted an incomplete or otherwise deficient inspection – failing to take all proscribed steps necessary to evaluate the full scope of frame flex in the unit. As a result, customers with frame failure may be told by Grand Design that their unit is safe.

158.    To make matters worse, once frame failure occurs, it is more likely to happen again in that vehicle, not least of all because the underlying defect remains unchanged.

159.    Many RVs have experienced multiple frame failures, even after repairs at the Grand Design service center. Grand Design technicians have advised customers that the frame failure "fix" is evolving.

160.    The fact that frame failure often recurs significantly diminishes the resale or trade-in value of Grand Design RVs, which, in turn, may be economically devastating to Grand Design's customers, many of whom are saddled with large outstanding loans. And the existence of a defect common to Grand Design frames means the value of Grand Design RVs is diminished even before frame failure has occurred.

**D.    Public Denial and Private Censorship: How Grand Design Has Tried to Dodge Liability**

161.    Since at least 2020, Defendants have been on notice of the widespread frame failure problem among Grand Design purchasers, which has been discussed across social media platforms, reported directly to the company, and reported to NHTSA.

162.    Indeed, high-level personnel at Winnebago monitor Facebook Groups and YouTube channels that document purchasers' problems with Grand Design frames and have discussed these complaints in public and private meetings with customers.

163.    One Facebook group, "Grand Design RV Owners with Issues," has over 14,000 members. The group description reads: "This group was started as a support group for Grand Design RV owners that have had issues with their campers due to either poor construction, non-existent quality control, or a failed warranty program."

164.    Another Facebook group, "Grand Design RV Major Issues," has more than 5,000 members and has been growing by roughly 100 members per week. Among members, frame failure in model year RVs manufactured in 2021 to 2023 is prevalent.

165.    There are also more than 30 YouTube channels that discuss frame failure problems with Grand Design RVs.

166.    What's more, many Grand Design RV owners are older, possibly retired adults, who may not be aware that these social media groups and channels exist. Accordingly, a large segment of Grand Design's customers (unlike the company itself) are likely unaware of the frame defect in the RV they purchased.

167.    Defendants, but not their customers, were also made aware of the systemic problem with Grand Design RVs by skyrocketing warranty claims.

168.    Winnebago saw a 278% increase in warranty claims between 2017 and 2023.

169.    In 2024, Grand Design's warranty claims amounted to $98 million, its highest amount since 2017.

170.    And on March 27, 2025, in a Q2 Financial Results Call, Brian Hughes, the Senior

Vice President and Chief Financial Officer of Winnebago Industries stated "our Winnebago towables business is going through a reconstruction or revitalization as we've talked about earlier in the call here. And as we address the ***historical quality issues*** that this business has had, ***we are certainly experiencing elevated warranty expense as a percent of sales***, and we hold this to be more transitory. In our Grand Design Towables business, I'll remind you of the longer history as it relates to warranty expense and experience in this business, where we had a couple of years, fiscal twenty twenty three and fiscal twenty twenty four, where warranty expense as a ratio of sales was notably lower relative to the long term trend. In fiscal twenty twenty five now, we have seen warranty expense ratio of sales rise as sales gone through the trough of the cycle to maybe call it 30 to 50 basis points higher than historical levels ***as a result of addressing some broader quality campaigns***."[66]

171.    In other words, Defendants are well aware of the ongoing, self-characterized "quality issues" with their Grand Design RVs, and the increasing frequency of frame failure in their RVs.

172.    And yet, Defendants have never issued a recall of these defective and dangerous RVs.

173.    Rather than recalling their dangerous RVs or warning past purchasers and potential customers of the known risks, Defendants have repeatedly and publicly denied that frame failure is an ongoing issue, brushing it off as "rumors" and "misinformation."[67]

174.    For example, on a 2024 investor call, Winnebago CEO Mike Happe dismissed the frame failure claims as "misinformation that has been disseminated on social media."[68]

175.    Happe asserted that "[l]ess than 1% of all Grand Design fifth wheels built in the entire history of its company have experienced any sort of excessive frame flex issue." He further

---

[66] Earnings call transcript: Winnebago Q2 2025 sees stock surge on EPS beat By Investing.com
[67] Winnebago Industries (WGO) Q3 2024 Earnings Call Transcript | The Motley Fool
[68] *Id.*

claimed that the issue is "not as large in actuality from a unit impact standpoint, nor in financial impact as several stakeholders perceive it to be."

176.    Grand Design's customers disagree.

177.    Happe has likewise misstated the cost and reality of repairs, stating that Winnebago "do[es] have some, of course, experience where we've seen it," but that "the cost per fix is . . . not meaningful."[69] He also claimed that "Grand Design has always taken care of the customers," as part of its "goodwill practices."

178.    Grand Design's customers again disagree.

179.    Defendants have also sought to shift blame to customers. Grand Design's website has a page dedicated to Frequently Asked Questions about frame failure, which states that "numerous factors may contribute to excessive frame flex," such as use-related causes like "road impacts, collisions, loading and weight distribution." [70]

180.    However, Grand Design RVs are intended to travel the road and serve as a home on wheels—so customers reasonably expect that their frames can handle normal road and bear the load that full-time living necessarily entails. And how weight is distributed across the frame is directly tied to the floorplans that Grand Design has designed for its RVs.

181.    Ultimately, Defendants' public statements are a façade. Even as they have sought to deny the existence of a problem and shift blame when frame failure occurs, Defendants have privately discussed the growing complaints of frame failure.

182.    High-level personnel at both Winnebago and Grand Design have known for years about the hardship their customers experience in trying to address frame failure and the other problems caused by the defect in Grand Design frames.

183.    Repairing a fifth wheel frame is an expensive and risky undertaking. And according to the RVIA, 43 percent of full-time RVers are retired and 72 percent have an income of under

---

[69] *Id.*

[70] https://www.granddesignrv.com/owners/resources/frame-faq

$65,000 per year.[71] Thus, for many Grand Design customers, the thousands of dollars they spend on repairs—due to Defendants' defectively designed frames and failure to warn their customers of this defect—is substantial. And this does not even account for the out-of-pocket expenses associated with losing access to their home while it is being repaired.

184.    Grand Design's inability to fix its defective frames endangers the public and piles additional burdens on its customers.

185.    Furthermore, Defendants' failure to disclose the existence and prevalence of these defective frames in the Solitude, Momentum, Reflection, and Influence, and their continued actions aimed at burying the truth, render their affirmative statements of quality, safety, and durability misleading.

186.    But while Defendants have continued to deny the problem in public, in private, they have worked to cover-up their lie, now removing articles and references from Grand Design's website promoting its RVs as fit "for Full-Time Living."[72]

187.     Defendants' cover-up extends far beyond their own websites; they also work to silence disgruntled customers who are vocal about the problems they have faced, all with the goal of concealing the systemic defect in Grand Design RVs.

188.    Grand Design frequently censors customers with non-disclosure agreements (NDAs) in an attempt to avoid liability and conceal the defect in its RV frames.

189.    Some customers report that they have been offered free repairs from Grand Design in exchange for signing an NDA. This would appear to be what Winnebago CEO Happe was referring to when he referenced Grand Design's "goodwill practice."

190.    The NDAs imposed by Grand Design are unique and notable in that they include a clause requiring customers to remove all online posts criticizing the company or its RVs and

---

[71] Go RVing RV Owner Demographic Profile | RVIA

[72] See https://hntrbrk.com/winnebago/.

prohibiting customers from posting critical content ever again.[73]

191.    These NDAs thus harm the public by preventing potential victims and/or purchasers from learning about the danger of frame failure in Grand Design RVs. NDAs that shield the truth about defective products from the public are often (and rightly) unenforceable.

192.    The use of NDAs in these circumstances is especially pernicious because social media posts are one of the few mediums through which customers can learn about the systemic frame defects in Grand Design RVs. By requiring victims to remove their prior posts, Grand Design is removing one of the only sources of information available that might counteract the misleading marketing that Defendants direct toward customers and potential customers.

193.    In addition to forcing customers to take down their posts on social media and third-party online forums, Grand Design deletes the majority of posts with negative feedback about Grand Design frames on the forums that the company itself manages.

### E.    Grand Design's Technical Service Bulletin and New Warranty Are Insufficient to Resolve the Issue

194.    In March of 2024, Grand Design issued a Technical Service Bulletin ("TSB") to service technicians and dealers addressing the frame failure issue.

195.    Generally, an automaker will issue a TSB when it "becomes aware of common problems" recurring in a particular make or model of their vehicle. A TSB "typically covers parts or processes that malfunction but aren't considered safety issues."[74]

196.    Grand Design's TSB states that the frame issue may cause "cosmetic damage" due to "miniscule" frame flex. However, it then instructs dealers and service technicians to contact Grand Design if they observe "any structural damage," including broken welds or cracked and torn steel.

---

[73] "Grand Deception" — Winnebago Muzzles Outcry Over Major Problem That Owners Say Makes RVs Dangerous, Untowable, Worthless - HUNTERBROOK (hntrbrk.com)

[74] *CARFAX*, What is a TSB (Technical Service Bulletin), available at https://www.carfax.com/blog/tsb-technical-service-bulletin (last accessed September 14, 2024).

197.    Grand Design only issued this TSB for its Solitude and Momentum models, but not its Reflection and Influence models. Some customers suspect Grand Design excluded the Reflection line of RVs in particular—which is known to have frame failure issues—to avoid reputational harm to its best-selling RV.

198.    For Grand Design, the benefit of issuing a TSB, as opposed to a recall, is that it is not obligated to notify customers or pay for repairs out of warranty.

199.    What's more, while the TSB purportedly instructs RV technicians, including Grand Design's SRTs, on how to inspect for signs of frame failure, customers report that Grand Design agents only check the measurement from the pin box to the lower front corner of the RV to evaluate for excessive frame flex. But this metric fails to capture excessive flex across the entirety of the frame, such as failure in the front upper deck.

200.    Grand Design has thus hidden from its customers and/or publicly denied that the RVs they are towing and living in are compromised by a dangerous latent defect.

201.    Further, although Defendants issued a TSB encompassing certain Grand Design RVs, they do not acknowledge the structural defects within Grand Design RV frames and refuse to issue a recall.

202.    In contrast to a TSB, which is only provided to Grand Design dealerships, a recall would require Defendants to notify all purchasers of the defective frame, thereby providing much more appropriate notification to its customer base, many of whom are likely unaware that their Grand Design RVs sit atop frames that are highly likely to fail.

203.    In June 2024, Defendants attempted to placate concerned customers by announcing a new, extended warranty for Grand Design RVs. Under this "Five Year Limited Towable Frame Warranty" ("Warranty"),[75] consumers could now utilize a five-year retroactive warranty, which was made transferable to one other purchaser. All prior warranties issued by Grand Design had

---

[75]    See Grand Design Five Year Limited Towable Frame Warranty, https://www.granddesignrv.com/1-3-5-warranty

excluded frames from coverage entirely.

204.    All 2020 and later model-year Grand Design RVs could purportedly be covered by the Warranty, which was triggered from the original date of purchase by the consumer who first bought the RV, so long as they were (somehow) "registered to the vehicle owner's name with thirty (30) days of the date of purchase."

205.    Defendants touted this move as demonstrative of their unprecedented stance on the quality of Grand Design RVs. The new Warranty was also promoted as a boost to the resale value of Grand Design RVs.

206.    But what the Warranty really does is confirm Defendants' understanding of the defect in their frames and reveal their interest in minimizing their responsibility for it. That's for multiple reasons.

207.    *First*, because the frame defect is a latent one, there is no way to predict when an RV's frame will fail, and thousands of customers may not experience frame failure until they are outside the warranty window. The Warranty also offers no relief to those customers whose frames failed prior to June 2024 and who were forced to deal with the defect on their own, often at great expense.

208.    *Second*, Defendants have loaded the Warranty with preconditions and procedural requirements that are next to impossible for any customer to follow. As noted above, the Warranty only takes effect if "registered to the vehicle owner's name with thirty (30) days of the date of purchase," a seemingly impossible task for anyone who purchased an RV earlier than 30 days before the Warranty was first issued in June 2024. Additionally, the Warranty is limited to the original purchaser or the person to whom the Warranty was transferred within the warranty period, and it cannot be transferred more than once. This automatically excludes many purchasers of Grand Design RVs. And the Warranty also requires Grand Design to be notified of the covered defect within 20 days of when the defect "was discovered or *should have been discovered by a reasonable person exercising reasonable care*." This language sets up an escape hatch, allowing Grand Design to avoid repairing a customer's RV if it decides that the customer should reasonably

have discovered the defect earlier.

209.    *Third*, even customers who could overcome these initial hurdles face various reasons for denying coverage that Defendants have embedded into the Warranty itself. The Warranty excludes "[d]amage caused by overloading, excess weight or improper weight distribution," as well as "[d]amage caused by road surface conditions, including, but not limited to . . . gravel/sand, ruts, or pot holes."[76] But those purported sources of damage involve the basic function of Grand Design RVs, which customers expect to be able to handle normal road conditions as well the weight associated with full-time living. And, as outlined above, the purported weight capacity and distribution are directly tied to the floorplan designed by Defendants. In other words, because Grand Design has not designed a frame that lives up to its RVs' intended use, its Warranty excludes such use from coverage.

210.    *Fourth*, the Warranty also excludes "[a]ny and all components that are attached to the frame assembly in final stage production, including axles . . . sidewalls or any other body structural component, any components installed in the underbelly area between the frame rails or any other components not considered to be part of the welded frame assembly."[77] In this way, Grand Design's Warranty expressly excludes all foreseeable damage caused by its defective frame, aside from damage to the frame itself.

211.    *Finally*, customers attempting to exercise the Warranty have faced a series of practical challenges, citing red-tape restrictions from the company that make it difficult to obtain the repairs within a reasonable time. Because consumers must take their RV to Grand Design's facility in Indiana to address frame failure, consumers who are unable to haul their towable to that destination are foreclosed from exercising their Warranty rights.

212.    In short, the Warranty coverage is largely illusory to many customers.

---

[76] *Id.*

[77] See    Grand    Design    Limited    Five    Year    Towable    Frame    Warranty, https://www.granddesignrv.com/1-3-5-warranty

### III.    Plaintiffs' Experiences with Grand Design RVs and Frame Failure

#### A. Matthew Auble

213.    Plaintiff Matthew Auble purchased a new Momentum 399 TH from Orangewood RV (since acquired by Lazydays RV) in Surprise, Arizona, in August of 2022. Plaintiff lives full-time in his RV.

214.    Prior to purchasing his RV and in connection with this purchase, Plaintiff conducted significant research into Grand Design and its RV models. This research included reading materials shared on the Grand Design website; attending an in-person factory tour at Grand Design; engaging in the online factory tour; and investigating some of Grand Design's manufacturing processes.

215.    At no point while researching Defendants' RVs was Plaintiff aware of or notified by Defendants, in any manner, about issues with Grand Design RVs' frames.

216.    In June of 2024, Plaintiff travelled with his RV to Ohio. Upon arriving at his destination, Plaintiff observed severe damage to the interior of the bedroom, including damage to the frame extensions and walls. The RV bedroom "looked like it was eating itself."

217.    Upon examining the RV, Plaintiff discovered, among other things, multiple damaged welds in the front of his RV. Plaintiff determined that these issues were caused by excessive frame flex.

218.    Plaintiff was forced to cut his trip short and haul the RV back to Arizona so he could stay with friends and family while his RV was repaired. During this journey, the RV's condition continued to deteriorate: cargo doors opened while Plaintiff was driving on the road, trim molding and seals on the RV peeled away from their position, and Plaintiff observed a large gap in the hitch that connects the truck pulling the fifth wheel and the base of the king pin.

219.    Upon arriving in Arizona, and based on Grand Design's recommendation, Plaintiff found the closest Grand Design dealership and dropped off his RV for repairs in August of 2024. The repairs on Plaintiff's RV were not completed until March 14, 2025 – more than seven months later. Because Plaintiff lives full-time in his RV, he relied on the hospitality of friends and family

while he waited for his home to be repaired.

**B. Joseph Alterman**

220.    Plaintiff Joseph Alterman purchased a new 2022 Momentum 376THS in West Palm Beach in order around May of 2021.

221.    Prior to purchasing his RV and in connection with this purchase, Plaintiff researched Grand Design RVs by, among other things, reading brochures and speaking with a representative from Grand Design about Grand Design's RVs.

222.    At no point while researching Defendants' RVs was Plaintiff aware of or notified by Defendants, in any manner, about issues with Grand Design RVs' frames.

223.    The problems in Plaintiff's RV began when his RV left the lot, including damage to the cabin main door and door frame, and cracked wood in the interior of the RV.

224.    Around November of 2021, a transporter hauled Plaintiff's RV more than 850 miles to his location in Florida. Plaintiff arrived to inspect his RV and observed that multiple doors and latches in his unit were unable to lock. Plaintiff further observed wall damage on the corners and trim and detected a water leak in the forward pass-through compartment, even though the water had not yet been connected.

225.    In or around December of 2021, a Grand Design representative conducted a pre-delivery inspection of Plaintiff's RV. During this inspection, Plaintiff noticed, among other things, excessive squeaking in the floors. Making these initial repairs required multiple trips to an authorized dealership, Palm Beach RV.

226.    In 2022, Plaintiff was driving his RV through Orlando. While traveling on a busy highway, the doors to the storage compartment where Plaintiff stores propane tanks suddenly popped open. The propane locked doors opened while Plaintiff was driving with his RV on at least two occasions. Additionally, the front locked compartment of Plaintiff's RV, where the generator is stored, also popped open while Plaintiff was towing his RV

227.    Around October 2022, Plaintiff drove with his RV to South Carolina. After this trip, Plaintiff noticed that the front slides boxes of his unit were damaged, and the problems with his

floors persisted. As Plaintiff continued to use his RV, the issues worsened.

228.    Plaintiff had planned to take a trip with his family to Tennessee in his RV in the summer of 2023. However, due to concerns that his RV was not safe to drive, Plaintiff chose to fly and rent a car instead.

229.    In 2024, Plaintiff brought his RV in for a routine warranty inspection. He informed the technicians of the problems he was seeing in his unit, including the trim coming off the front of his unit, and the floors creaking loudly and moving excessively when walked on.

230.    In addition to this damage, Plaintiff has also observed, among other things, that his front stabilizers were misaligned; the doors of his RV are broken or loose; the slide boxes appeared to have excessive wear; and screws and wood trim were falling off inside his vehicle. Plaintiff requested that his dealership in Palm Beach repair these damages. However, he was informed that he would have to bring his RV to General RV in Orlando – a long trip, which he did not feel safe making given the RV's condition.

231.    Plaintiff believes this damage is all caused by frame failure in his RV. Plaintiff is concerned about his safety in traveling with his RV to have this evaluated, and moreover, is concerned that his problems with be dismissed by Grand Design as part of the company's cover-up of the widespread frame failure among its RVs.  As a result of these damages, Plaintiff has not used his RV since October 2024.

**C.  Don Bilyeu**

232.    A Plaintiff Don Bilyeu purchased a new 2022 Grand Design Solitude 372WB from a dealership in Oregon in 2022. Plaintiff and his spouse live full-time in their RV.

233.    Prior to purchasing his Grand Design RV and in connection with this purchase, Plaintiff researched Grand Design RVs by among other things, reading information on the Grand Design website and Consumer Reports.

234.    Shortly after purchasing the RV, Plaintiff began noticing problems. The walls to the bedroom were moving and popping off, the bedroom steps were pulling away, and the bedroom slide did not move smoothly.

235.    Plaintiff further observed the door to the generator popping open while driving; and observed sawdust coming down from the cabinetry, which shifted around during transit causing friction.

236.    Additionally, while the sliding door to the bathroom in the front cap had originally been flush to the doorjamb, as Plaintiff used his RV, a significant gap developed at the bottom of the door. Other doors in the RV shifted as well; for example, the closet doors in the front cap also developed a gap at the bottom, and the lock on the door began to pop out of the floor during travel, pulling up the flooring around the door. Plaintiff attempted to install an additional lock at the top of the closet, but that locked became displaced as well.

237.    The floors in Plaintiffs RV also began to creak loudly throughout the entire unit.

238.    While on a trip from Oregon to Arizona to spend the winter, Plaintiff stopped at Busted Knuckle, an RV mechanic in Las Vegas, to have his RV inspected. Plaintiff was immediately told not to drive his RV any further. The technicians at Busted Knuckles diagnosed Plaintiff's RV with frame failure.

239.    During this inspection, the RV technicians also discovered there were multiple missing lag bolts throughout Plaintiff's unit.

240.    Because Plaintiff and his spouse live full-time in their RV, they were displaced for three months during these repairs and had to rely on family hospitality while they waited for their home to be functional again.

241.    At his own expense, Plaintiff asked the mechanic to add cross-supports for more stability at the axels. While these repairs have resolved some of Plaintiff's problems, he remains concerned that the frame failure will recur.

### D.  Leo Critchfield

242.    Plaintiff Leo Critchfield purchased a new 390 RK Solitude in Nevada in July 2020. At the time of this purchase, Plaintiff was a resident of California.

243.    Prior to purchasing his RV and in connection with this purchase, Plaintiff researched the manufacturers of these RVs and researched the different RV models; Plaintiff

conducted this research by, among other things, reading information posted on Grand Designs' website and reading the warranty.

244.    At no point while researching Defendants' RVs was Plaintiff aware of or notified by Defendants, in any manner, about issues with Grand Design RVs' frames.

245.    Within the first six months of owning his RV, Plaintiff began experiencing issues with the slides that extended the RV's kitchen space.

246.    Plaintiff brought his RV to Blue Dog RV of Nevada, an authorized Grand Design dealership. His RV sat at this dealership, unusable, for eight months out of the first one-and-a-half years he owned the vehicle. Ultimately, Blue Dog purportedly repaired the RV and returned it to Plaintiff's control. Plaintiff was not informed that the problems were caused by excessive frame flex.

247.    Despite these repairs, new issues continued to arise in Plaintiff's RV. For example, Plaintiff observed interior flex on the walls, including the wall where his TV and fireplace are located. Additionally, Plaintiff's TV swings out when he is traveling, even though he has taken steps to secure the TV. Likewise, the front of Plaintiff's fireplace falls off every time he travels.

248.    On one occasion, while driving down the road, the glass shower door in Plaintiff's RV spontaneously shattered, even though the vehicle had been properly prepared for travel.

249.    In approximately March of 2024, the slides on Plaintiff's RV broke again. This time, the damage occurred while Plaintiff was using the RV on vacation. As a result of this defect, Plaintiff was unable to use half of his kitchen during his trip, including being unable to access cabinets and most of his sink.

250.    In June of 2024, Plaintiff brought his RV to a repair shop in Mohave, Arizona. The RV was not repaired until approximately October or November of 2024. Upon information and belief, the problems exhibited in Plaintiff's RV are caused by excessive frame flex.

### E.  Michael Croteau

251.    Plaintiff Michael Croteau purchased a new Momentum 376 THS from a dealership, Country Camper (since acquired by Blue Compass), in June of 2020 in Montpelier, Vermont. At

the time of purchase, Plaintiff was a resident of New Hampshire.

252.    Prior to purchasing his Grand Design RV and in connection with this purchase, Plaintiff conducted research into these RVs by, among other things, reading Grand Design's RV brochures.

253.    At no point while researching Defendants' RVs was Plaintiff aware of or notified by Defendants, in any manner, about known or reported issues with the frame of Grand Design's RVs.

254.    Approximately one-and-a-half years after purchasing the RV, Plaintiff began noticing significant cosmetic damages to his unit: the closet frame separated from the wall; the facial trim, doors and drawers no longer shut correctly; and the doors to his bathroom and bedroom were crooked. At the time, Plaintiff was unaware that these are symptoms of frame failure.

255.    In the summer of 2024 while performing routine maintenance, Plaintiff identified a broken shackle on the rear axle of his RV. He contacted Grand Design and brought his unit to the Blue Compass dealership in Vermont from which he purchased the RV, where the RV was repaired.

256.    After these repairs were made, Plaintiff believed his RV would be safe to drive to Florida for the winter. However, while driving through North Carolina around October 31st, 2024, the shackle on the opposite axel of his RV broke. Plaintiff had to haul his RV to Performance Trailers in Mooresville, North Carolina to have it repaired, and pay for the work out-of-pocket. The repairs were completed on November 2nd, 2024.

257.    Plaintiff arrived in Florida in November of 2024, and returned to New Hampshire in approximately late April of 2025. Upon returning to New Hampshire, Plaintiff brought his RV to the Blue Compass dealership in Vermont for additional repairs. The dealership informed Plaintiff that the structure of his vehicle is compromised beyond repair. Upon information and belief, the problems exhibited in Plaintiff's RV are caused by excessive frame flex.

**F.  Andrew and Lucy Hallberg**

258.    Plaintiffs Lucy and Andrew Hallberg sold their home and purchased a new 378

Solitude MBS in September of 2021 in Acworth, Georgia. Plaintiffs live full time in their RV.

259.    Prior to purchasing their RV and in connection with this purchase, Plaintiffs researched Grand Design RVs extensively by, among other things, watching YouTube videos of Grand Design ambassadors, reading reviews shared online, and speaking with a representative from Grand Design about Grand Design's RVs.

260.    At no point while researching Defendants' RVs was Plaintiff aware of or notified by Defendants, in any manner, about known or reported issues with the frame of Grand Design's RVs.

261.    Less than one year after purchasing their RV, Plaintiffs noticed movement in the frame of their walk-in closet. Plaintiffs further observed fasteners coming through the floor; the interior walls and corners of the unit were pulling away from the exterior walls; and the trim strips began popping off.

262.    As time progressed, the condition of Plaintiffs RV continued to deteriorate. Plaintiffs observed bowing in the floorboards. The slide was off center and caught on the floor, causing damage. The structure of the rear wall of the unit detached, causing both side panels to pinch and bend. Fasteners continued to come loose, with screwheads popping out from behind the couch and rolling across the floor.

263.    In or around August of 2024, Plaintiffs took their RV to a dealership. Plaintiffs were informed that the dealership was unable to fix their unit for several months.

264.    After spending seven months without their home, around February of 2025 Plaintiffs retrieved their RV from the dealership where it was being kept, and towed it to PleasureLand RV Center in Sioux Falls, South Dakota, hoping to have repairs made so they could return to full-time living in their RV.

265.    The RV service technicians at PleasureLand RV informed Plaintiffs that the condition of their RV was due to excessive frame flex. For the next several months, technicians at Pleasureland RV corresponded with Grand Design regarding the status of Plaintiffs' RV.

266.    In April of 2025, Grand Design notified Plaintiffs that a representative from Grand

Design was going to travel to Pleasureland to inspect the RV. Grand Design informed Plaintiffs of a specific date when they would arrive for such work, and Plaintiffs intended to be present for this inspection to oversee the work done on their unit. Grand Design was aware of this intent.

267.    However, the Grand Design technician arrived two weeks earlier than stated and did not notify Plaintiffs of this change of plan. Instead, the Grand Design representative contacted Plaintiffs *after* finishing their visit to notify Plaintiffs that the matter was completed. Despite the evaluation from the Pleasureland RV technician, Grand Design claimed the issue arose from Plaintiffs' use of the vehicle, and not the frame.

268.    Plaintiffs were not afforded the opportunity to look at their unit before Grand Design representatives instructed the technicians at Pleasureland to close the RV, and the matter was determined "finished."  Grand Design has repeatedly refused to provide Plaintiffs with a copy of the report associated with its inspection of the unit.

269.    Plaintiffs' RV is still at PleasureLand RV. Plaintiffs have not been able to verify that the frame issues have been resolved.

270.    Since August 2024, Plaintiffs have been unable to live in their RV due to its defective condition. Instead, Plaintiffs have been living at a property that they typically rent out as a source of income. Due to the ongoing nature of this issue, Plaintiffs have lost income, and continue to lose income, that they otherwise would have received from the rental property.

### G.  Michael O'Neal

271.    Plaintiff Michael O'Neal purchased his Solitude 390 RKR in 2022 from General RV in Cleveland, Ohio. He purchased the RV two-months used for approximately $100,000.

272.    Prior to purchasing his Grand Design RV and in connection with this purchase, Plaintiff conducted research including, among other things, reading information on Grand Design and Winnebago's websites; reading about Grand Design's SRT teams; watching content created by Grand Design ambassadors discussing the RVs; and reviewing information provided in Grand Designs' brochures.  At no point while researching Defendants' RVs was Plaintiff aware of or notified by Defendants, in any manner, about known or reported issues with the frame of Grand

Design's RVs.

273.    Mr. O'Neal was and remains an Ohio resident. However, he is also a full-time RVer, and purchased his Grand Design RV with the intention of travelling the country.

274.    Within the first 1.5 months of owning the RV, Mr. O'Neal noticed that the rear kitchen slides were becoming increasingly difficult to open and close. As the slides failed, the floor of the RV became ripped up, and the fiberglass on the exterior of the RV cracked. Because Mr. O'Neal had purchased his RV two months used, Grand Design initially declined to repair the RV for being out of warranty. Mr. O'Neal hired several RV repair technicians to address the issue, but none were successful.

275.    In or around December of 2022, Grand Design acquiesced and offered to take Mr. O'Neal's RV to its factory in Indiana and attempt repairs. The RV remained at the factory for one week until repairs were complete.

276.    Just five days after retrieving the RV from the Grand Design factory, however, Mr. O'Neal once again began to observe major problems in his RV.

277.    Over the next several months Grand Design sent three SRTs out to Mr. O'Neal to fix his unit; each time, the RV began experiencing problems again shortly after the repair. When the third SRT arrived to evaluate the problem, they informed Mr. O'Neal that his RV would need to go back to Grand Design's Indiana factory for repairs. However, Grand Design informed Mr. O'Neal he would have to wait six months for an appointment.

278.    During the interim six months, Mr. O'Neal's RV continued to deteriorate. He found loose screws, unattached lag bolts, cracks through which daylight could be seen, and more. As put by Mr. O'Neal: "We lost our home. It literally fell apart around us while we were driving down the road."

279.    But when Mr. O'Neal was finally able to bring his RV to the Indiana factory for repairs, Grand Design informed him that the damage to his RV was not covered under their extended 5-year warranty. Grand Design refused to repair Mr. O'Neal's RV and insisted that his insurance declare the unit a "total loss." This process took nine weeks, during which time Mr.

O'Neal – a full time RVer – lived in hotels or relied on family and friends for housing.

280.    After having his RV declared a total loss, Mr. O'Neal no longer owns his Grand Design RV.

**H.  Daniel Peabody**

281.    Plaintiff Daniel Peabody purchased his Momentum 397 TH in or around May of 2022. He purchased the RV from its previous owner, who had owned it for one year.

282.    Prior to purchasing his Grand Design RV and in connection with this purchase, Plaintiff researched Grand Design RVs by, among other things, reading Grand Design's RV brochures, attending RV shows where Grand Design had exhibitions, reading information on the Grand Design website, and watching content created by Grand Design ambassadors.

283.    At no point while researching Defendants' RVs was Plaintiff aware of or notified by Defendants, in any manner, about known or reported issues with the frame of Grand Design's RVs.

284.    At the time of purchase, Mr. Peabody was a resident of Arizona. However, he purchased the RV with the intention of using the RV to move to Florida, and indeed, two months after purchasing the RV, Plaintiff sold his home and used his RV to move to Florida.

285.    In approximately February of 2023, Plaintiff discovered spider-cracking in the front nose column of his RV. He contacted Grand Design about this issue, but did not hear back.

286.    Problems with Plaintiff's RV continued to worsen: the RV's interior wall covering began wrinkling; pieces of interior trim came loose; screws were protruding from the floor in the master bedroom; and Plaintiff noticed scratches on the upper walls where the 90-degree joints of the RV connected. Beyond these cosmetic issues, the lower cargo door of Plaintiff's RV came open during travel on at least two occasions. On one such occasion, Plaintiff lost cargo that was stowed beneath the vehicle.  Unbeknownst to Plaintiff, these symptoms are all telltale signs of frame failure.

287.    In April of 2024, after reporting these increasing issues to Grand Design, Plaintiff was advised to haul his RV to Ocala, Florida to have the unit inspected. At the inspection, the

service repair technician ("SRT") diagnosed Plaintiff's RV with excessive frame flex.

288.    Grand Design informed Plaintiff that he could not leave with his RV until repairs were complete. During this time, Plaintiff had been living full-time in his RV and therefore had to pay out-of-pocket for accommodation while his RV was repaired. The repairs were not completed until July 20th, 2024 – nearly four months later.

289.    During this time, Plaintiff purchased a home in Florida. When the repairs on his RV were completed, he hauled the unit back to his new home. After this time, Plaintiff  no longer felt comfortable hauling his RV due to concerns about its safety and operability. Plaintiff has since sold his RV for a significant loss.

**I.  Gary Pfeiffer**

290.    Plaintiff Gary Pfeiffer purchased a new 2022 Momentum from Pontiac RV in Pontiac, Illinois in January 2022.

291.    Prior to purchasing his Grand Design RV and in connection with this purchase, Plaintiff researched Grand Design and its RVs by, among other things, reading Grand Design RV brochures, attending RV shows where Grand Design had exhibitions and discussing the quality of Grand Design's RVs with its representatives, and performing extensive research on the Grand Design website.

292.    At no point while researching Defendants' RVs was Plaintiff aware of or notified by Defendants, in any manner, about known or reported issues with the frame of Grand Design's RVs.

293.    In roughly September of 2023, Plaintiff noticed the slides rubbing and requested that a Grand Design SRT inspect the RV. The SRT represented that he fixed the slide and Plaintiff thereafter took the Momentum down to Texas.

294.    In Texas, Plaintiff noticed more problems with the slide and requested that a SRT come to inspect the RV. The SRT advised Plaintiff to contact Grand Design to repair the slide. At Grand Design's recommendation, Plaintiff hauled his Momentum to Grand Design headquarters in Elkhart.

295. In December 2023, Grand Design personnel identified the problem as frame flex and kept Plaintiff's RV for nearly two weeks to allegedly conduct repairs. Plaintiff was advised that technicians repaired the slide and re-welded the frame, among other things.

296. When the Momentum was ready, Plaintiff retrieved it and headed down to Florida for the holidays. By the time he arrived in Florida, however, the Momentum was exhibiting more problems. The slide was dragging and making grinding noises, sawdust littered the inside floors, and the cabinets would not open or close. Unbeknownst to Plaintiff, these were telltale signs of frame failure.

297. Frustrated with this recurring, seemingly unfixable problem, Plaintiff traded in his Momentum at approximately $20,000 to $30,000 loss. Plaintiff no longer owns a Grand Design RV.

**J.   Collin Reese**

298. Plaintiff Collin Reese purchased a new Solitude 310GK in November 2021 in Grand Junction, Colorado.

299. Prior to purchasing his Solitude, Plaintiff researched Grand Design and its RVs by, among other things, attending Grand Design exhibitions at RV shows, touring the Solitude, speaking to other Solitude owners, performing extensive research on the Grand Design website, and watching content created by Grand Design ambassadors.

300. At no point while researching the Solitude was Plaintiff aware of or notified by Defendants, in any manner, about known or reported issues with the frame of Grand Design's RVs.

301. In approximately September 2024, Plaintiff discovered several troubling signs of frame failure, including nail-heads popping up through the flooring, wall trim shifting from its original location, walls warping, lag bolts falling out of place and disengaging, as well as fractures and splitting of the RV's frame.

302. In approximately September 2024, Plaintiff brough his RV to Centennial RV, LLC, where he had purchased the Solitude, for assessment and repairs. There, a service associate noted that the metal was coming apart and emphasized that the RV was experiencing "serious frame

issues" that required manufacturer's repairs. Shortly thereafter, Grand Design sent an SRT to assess the damage.

303.    The SRT subsequently oversaw the removal of the front undercarriage of Plaintiff's RV and confirmed that there were broken screws and metal in the framing, several bolts and nails protruding through the linoleum, and that the Seal Plate was fractured.

304.    Grand Design informed Plaintiff that he could not leave with his RV until repairs were complete. Plaintiff's RV remained at Centennial from approximately September 2024 through January 2025.

305.    However, after reinstallation, the filon on Plaintiff's RV began showing signs of waves.

306.    Accordingly, Plaintiff does not feel fully safe using his RV and his use of the vehicle has decreased accordingly.

**K. Jim Rieber**

307.    Plaintiff Jim Rieber purchased a new Momentum 351M RV in August 2020 in Minnesota.

308.    Prior to purchasing his Grand Design RV and in connection with this purchase, Plaintiff researched Grand Design and its RVs by, among other things, reading Grand Design RV brochures, attending a tour of the Grand Design RV plant, attending RV shows where Grand Design had exhibitions and discussing the quality of Grand Design's RVs with Grand Design representatives, and reading information about the RVs on Grand Design's website.

309.    At no point while researching Defendants' RVs was Plaintiff aware of or notified by Defendants, in any manner, about known or reported issues with the frame of Grand Design's RVs.

310.    In approximately October 2023, Plaintiff was traveling with his RV when one of the slides dropped out and the springs broke. Plaintiff had the springs replaced; however, he began noticing other issues, including shifting cabinets.

311.    In approximately June of 2024, Plaintiff brought his RV to Pleasureland RV, a

49

Grand Design authorized dealership in Minnesota, to have repairs made. Grand Design personnel diagnosed his RV with excessive frame flex and kept the unit for three weeks to identify and repair the problems.

312.    After these initial repairs were made, Plaintiff continued to use his RV. Shortly thereafter, Plaintiff noticed loose bolts, problems with his cabinets, and spider-cracking in the nose cap of his RV.

313.    Grand Design picked up Plaintiff's RV from Minnesota in September of 2024 and hauled it to the Grand Design center in Indiana to make repairs. Plaintiff's RV remained in Indiana through the end of October, during which time Grand Design added approximately 300 pounds of metal reinforcement to the RV.

314.    Plaintiff retrieved his RV in late October of 2024 and hauled it to Arizona for the winter. While Plaintiff plans to haul the RV back to his home in Minnesota this spring, after this final trip, he will no longer use his RV for travel due to his concerns that the unit will break down again.

**L. Matthew Thompson**

315.    Plaintiff Matthew Thompson purchased a new 2022 Reflection on December 16, 2022.

316.    Prior to purchasing his Grand Design RV and in connection with this purchase, Plaintiff researched Grand Design and its RVs by, among other things, reading Grand Design RV brochures, attending RV shows where Grand Design had exhibitions and discussing the quality of Grand Design's RVs with its representatives, and conducting extensive research on Grand Design's website.

317.    At no point while researching Defendants' RVs was Plaintiff aware of or notified by Defendants, in any manner, about known or reported issues with the frame of Grand Design's RVs.

318.    However, Plaintiffs' nightmare began immediately after purchase. On the day of pick up, the leveling system on Plaintiff's RV was not functional, thus requiring immediate repairs.

One week later, in approximately late-December 2022, the couch slide out would not go in or out correctly.

319.    Plaintiff notified Grand Design, who subsequently confirmed that his RV again needed immediate repair. Plaintiff was instructed to return his RV to the dealer where it remained for two months. Due to the amount of time his RV spent in the shop, Grand design offered him one three-month warranty extension. Grand Design did not use the term frame flex when discussing the damage to Plaintiff's RV at that time, nor did Plaintiff have a reason to believe that his RV was experiencing frame failure at that time.

320.    However, Plaintiffs' nightmare persisted and between January 2023 and July 2024, Plaintiff sought repairs on at least four separate occasions to address issues related to the back wall bending, sagging, and falling apart, the outriggers collapsing, dips and slopes in the floor of his RV, interior panels bowing and detaching from the walls, and the RV's walls shifting off of the RVs frame, as well as a litany of other issues. Further, during that time, Plaintiff noticed that several pieces of trim in his RV have shifted and fallen off, and that his outrigger is bent.

321.    In total, since December 2022, Plaintiff's RV has required approximately 10 months of repairs, during which time Plaintiff spent thousands on monthly payments, yet was unable to use his RV.

**L.  Gustav Vanzyl**

322.    Plaintiff Gustav Vanzyl purchased a new 2022 Momentum 397 in California in approximately May 2022.

323.    Prior to purchasing his Grand Design RV and in connection with this purchase, Plaintiff researched Grand Design and its RVs by, among other things, reading Grand Design RV brochures, discussing Grand Design's RVs with Grand Design representatives by phone, performing extensive research on the Grand Design website, and watching content created by Grand Design ambassadors on YouTube.

324.    At no point while researching Defendants' RVs was Plaintiff aware of or notified by Defendants, in any manner, about known or reported issues with the frame of Grand Design's

RVs.

325.    Shortly after purchase, Plaintiff noted that the pin box assembly was receding into the trailer. However, he was repeatedly assured by dealers that the cracking and popping noises associated with putting weight on the pinbox were a common occurrence and there was no cause for concern. Approximately six months later, Plaintiff's closet doors began moving and shifting from their original locations, significant amounts of trim began falling off the inside of his RV, and his propane door began opening suddenly in transit. Plaintiff again brought these issues up to local dealers, who again told him that these were common occurrences and nothing to be concerned about.

326.    And yet, Plaintiff's problems persisted. In 2024, he brought his RV to a dealership in Salt Lake City because he was unable to get his RV level. When the issue was escalated to Grand Design, a Grand Design representative confessed that because the generator was supported only by the pin box, it had caused a twist and sag in his frame.

327.    Later in 2024, Plaintiff noticed that the filon was separating from the front cap of his RV. Accordingly, Plaintiff has not driven his RV since and intends to bring his RV to the Busted Knuckle dealership in Nevada to address the issues with his RVs frame.

## CLASS ACTION ALLEGATIONS

328.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the classes. This action satisfies the requirements set forth in Rule 23(a), Rule 23(b)(2), and Rule 23(b)(3).

329.    Plaintiffs bring this action on behalf of the following class(es) (together referred to as the "Class"):

> **Nationwide Class:** All individuals in the United States who purchased one or more model year 2020-2023 Grand Design RVs and (a) continue to own the RV or (b) sold or disposed of the RV either (i) after it experienced frame failure and/or excessive frame flex or (ii) on or after March 2024.

> **Arizona Subclass:** All individuals who resided in Arizona and purchased

one or more model year 2020-2023 Grand Design RVs and (a) continue to own the RV or (b) sold or disposed of the RV either (i) after it experienced frame failure and/or excessive frame flex or (ii) on or after March 2024.

**California Subclass:** All individuals who resided in California and purchased one or more model year 2020-2023 Grand Design RVs and (a) continue to own the RV or (b) sold or disposed of the RV either (i) after it experienced frame failure and/or excessive frame flex or (ii) on or after March 2024.

**Colorado Subclass**: All individuals who resided in California and purchased one or more model year 2020-2023 Grand Design RVs and (a) continue to own the RV or (b) sold or disposed of the RV either (i) after it experienced frame failure and/or excessive frame flex or (ii) on or after March 2024.

**Florida Subclass:** All individuals who resided in Florida and purchased one or more model year 2020-2023 Grand Design RVs and (a) continue to own the RV or (b) sold or disposed of the RV either (i) after it experienced frame failure and/or excessive frame flex or (ii) on or after March 2024.

**Georgia Subclass:** All individuals who resided in Minnesota and purchased one or more model year 2020-2023 Grand Design RVs and (a) continue to own the RV or (b) sold or disposed of the RV either (i) after it experienced frame failure and/or excessive frame flex or (ii) on or after March 2024.

**Illinois Subclass:** All individuals who resided in Illinois and purchased one or more model year 2020-2023 Grand Design RVs and (a) continue to own the RV or (b) sold or disposed of the RV either (i) after it experienced frame failure and/or excessive frame flex or (ii) on or after March 2024.

**Minnesota Subclass:** All individuals who resided in Minnesota and purchased one or more model year 2020-2023 Grand Design RVs and (a) continue to own the RV or (b) sold or disposed of the RV either (i) after it experienced frame failure and/or excessive frame flex or (ii) on or after March 2024.

**New Hampshire Subclass:** All individuals who resided in New Hampshire and purchased one or more model year 2020-2023 Grand Design RVs and (a) continue to own the RV or (b) sold or disposed of the RV either (i) after it experienced frame failure and/or excessive frame flex or (ii) on or after March 2024.

**Ohio Subclass:** All individuals who resided in Ohio and purchased one or more model year 2020-2023 Grand Design RVs and (a) continue to own the RV or (b) sold or disposed of the RV either (i) after it experienced frame failure and/or excessive frame flex or (ii) on or after March 2024

**Oregon Subclass**: All individuals who resided in Minnesota and

purchased one or more model year 2020-2023 Grand Design RVs and (a) continue to own the RV or (b) sold or disposed of the RV either (i) after it experienced frame failure and/or excessive frame flex or (ii) on or after March 2024.

330. For purposes of the class definitions set forth above, "Grand Design RV" shall be defined as the following RV models: Reflection, Influence, Solitude, and Momentum.

331. Excluded from the Class are Defendants, their legal representatives, assigns and successors, and any entity in which Defendants have a controlling interest. Also excluded is the judge to whom this case is assigned and any member of the judge's immediate family and judicial staff.

332. This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

333. Numerosity (Rule 23(a)(1)): Although the actual size of the Class is uncertain, Plaintiffs are informed and believe that the Class is comprised of at least thousands of purchasers of Grand Design RVs, making joinder impracticable. The disposition of the claims of the Class in a single action will provide substantial benefits to the parties and the Court.

334. Commonality (Rule 23(a)(2)): Questions of law and fact common to Plaintiffs and the Class include, but are not limited to, the following:

a. Whether Defendants owed a duty of care to Plaintiffs and the Class;

b. Whether Grand Design RVs were manufactured with defective frames;

c. Whether Defendants knew or should have known that Grand Design RVs were manufactured with defective frames;

d. Whether Defendants failed to disclose and/or warn that Grand Design RVs were manufactured with defective frames;

e. Whether Defendants represented that the frames installed in Grand Design RVs were not defective;

f. Whether Defendants marketed Grand Design RVs as being fit for a use inconsistent with what the fame could handle;

g. Whether reasonable consumers would believe that the frames installed in Grand

Design RVs were fit for their intended use;

h. Whether Defendants continued to manufacture and sell Grand Design RVs manufactured with defective frames even after they reasonably knew or should have known that the frames were defective;

i. Whether Defendants' omission of the presence of defective frames was likely to mislead, deceive, confuse, or confound consumers acting reasonably;

j. Whether Defendants unjustly enriched themselves at consumers' expense;

k. Whether Plaintiffs and the Class are entitled to actual, statutory, and treble damages; and

l. Whether Plaintiffs and the Class are entitled to declaratory and injunctive relief.

335. Typicality (Rule 23(a)(3)): The claims of the representative Plaintiffs are typical of the claims of members of the Class, in that the representative Plaintiffs, like all members of the Class, purchased Grand Design RVs without knowing that they were manufactured with defective frames. If Plaintiffs had known that information, they would not have purchased the Grand Design RVs. All members of the Class are in a similar position. Thus, the representative Plaintiffs, like all members of the Class, have suffered a common injury. The factual basis of Defendants' misconduct is common to all members of the Class.

336. Adequacy (Rule 23(a)(4)): Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving consumer fraud and false advertising, product defects, and violation of consumer protection statutes. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the Class.

337. Predominance of Common Questions (Rule 23(b)(3)): The aforementioned common questions of law and fact predominate over any questions involving individualized analysis. There are no fundamental questions of law or fact that are not common to members of

the Class.

338.    <u>Superiority (Rule 23(b)(3))</u>: Plaintiffs and members of the Class have suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Most members of the Class likely would find the cost of litigating their individual claims to be prohibitive and will have no adequate remedy at law. Thus, absent a class action, members of the Class will continue to incur damages and Defendants' misconduct will proceed without remedy. Class treatment of common questions of fact and law is superior to multiple individual actions or piecemeal litigation because it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication. There is no impediment to the management of this action as a class action because the questions of fact and law are virtually identical for Plaintiffs and all Class members.

339.    <u>Injunctive Relief (Rule 23(b)(2))</u>: Defendants have engaged in, and continue to engage in, practices that are unfair and fraudulent by, among other things, failing to disclose the material fact that the frames installed in Grand Design RVs are defective and prone to failure. Plaintiffs seek class-wide injunctive relief on grounds consistent with the standards articulated in Rule 23(b)(2) that establish final injunctive relief as an appropriate class-wide remedy, in that Defendants continue to deny that Grand Design RV frames are defective and refuse to issue a recall, which would sufficiently inform purchasers that Grand Design RVs are defective. The injuries suffered by Plaintiffs and the Class as a result of Defendants' actions are ongoing.

<b><u>CAUSES OF ACTION</u></b>

<b><u>FIRST CAUSE OF ACTION</u></b>

<b>Violation of the Indiana Deceptive Consumer Sales Act<br>(On Behalf of Plaintiffs and the Nationwide Class)</b>

340.    Plaintiffs incorporate by reference all preceding allegations contained in this Complaint.

341.    This claim for relief is brought by Plaintiffs, individually and on behalf of the

56

Nationwide Class, against Defendants.

342.    Grand Design and Winnebago are "persons" within the meaning of Ind. Code § 24-5-0.05-2(a)(3).

343.    Plaintiffs' purchases of Grand Design RVs are "consumer transactions" within the meaning of Ind. Code § 24-5-0.05-2(a)(1).

344.    Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes representing: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model if it is not and if the supplier knows or should reasonably know that it is not; . . . (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; . . . (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

345.    Defendants participated in misleading, false, or deceptive acts that violated the Indiana DCSA. By systematically concealing the extent and prevalence of the frame defect in Grand Design RVs, Defendants engaged in deceptive business practices prohibited by the Indiana DCSA. Defendants also engaged in unlawful trade practices by: (1) representing that Grand Design RVs have characteristics, uses, benefits, and qualities that they do not have; (2) representing that Grand Design RVs are of a particular standard and quality when they are not; (3) advertising Grand Design RVs with the intent not to sell them as advertised; and (4) otherwise engaging in conduct likely to deceive. The defects in each RV include not only the specific frame defect but also include

the defective processes through which Defendants built the RVs, a process that included cost-cutting, minimizing the importance of safety issues, the failure to follow acceptable manufacturing processes and to design RV frames that were fit for purpose. All of these defective processes would be material to a reasonable consumer.

346.    Defendants' actions, as set forth herein, occurred in the conduct of trade or commerce.

347.    In the course of their business, Defendants concealed the defects in Grand Design RVs as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Grand Design RVs.

348.    From at least 2020, Defendants knew the frames utilized in Grand Design RVs were defective because they were not designed to support the weight and size of Grand Design RVs.

349.    And even after realizing that their frames were defective by design, Defendants refused to redesign them, in part, because doing so would have been more costly (both in terms of time and resources) than quickly capitalizing on increased demand for RVs.

350.    Instead of disclosing these frame defects, Defendants actively concealed them.

351.    Instead of disclosing these frame defects, Defendants continued marketing the RVs as safe, reliable, and fit-for-purpose.

352.    However, it is not possible to have a safe, reliable, fit-for-purpose RV if the frame—upon which the living quarters, walls, and weight of the vehicle rests—is not able to support that weight.

353.    Thus, Defendants actively concealed the fact that it was not possible to purchase a safe, reliable, or fit-for-purpose Grand Design RV.

354.    However, this information and knowledge was not shared with customers, and

instead remained within the sole possession, custody, and control of Defendants.

355.    The failure to disclose this knowledge represents an unfair and deceptive business practices in violation of the Indiana DCSA.

356.    Defendants' unfair or deceptive business practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their Grand Design RVs.

357.    Defendants numerous, repeated, and frequent representations about the safety and reliability of their RVs, as well as their failure to disclose the known defects inherent in the RVs' frame, was calculated to capitalize on Grand Design's goodwill, while misleading consumers about new, emerging, and increasingly prevalent issues with the safety, quality, and reliability of their RVs.

358.    Defendants intentionally and knowingly misrepresented material facts regarding the Grand Design RVs with the intent to mislead Plaintiffs and reasonable consumers.

359.    Defendants knew or should have known that their conduct violated the Indiana DCSA.

360.    Defendants owed Plaintiffs and all reasonable consumers a duty to disclose the true safety and reliability of the Grand Design RVs because Defendants (i) possessed exclusive knowledge about the frame defects in the Grand Design RVs; (ii) intentionally concealed the foregoing from Plaintiffs and their customers; and/or (iii) made incomplete representations about the safety and reliability of the Grand Design RVs, while purposefully withholding material facts from Plaintiffs and their customers that contradicted these representations.

361.    Because Defendants improperly concealed the frame defect in the Grand Design RVs, Plaintiffs and the proposed class members were deprived of the benefit of their bargain since the RVs they purchased were worth less than they would have been if free from defects.  Further, Plaintiffs and proposed class members have spent their time and money to attempt to repair their Grand Design RVs and/or to deal with the inconveniences and hardship caused by their Grand Design RVs following frame failure. Had Plaintiffs and the proposed class members been aware

of the frame defects in their Grand Design RVs, they would have either not purchased those RVs or paid less for them.

362.    Plaintiffs and the proposed class members were also harmed by Defendants' unfair and deceptive trade practices since their RVs are and/or were worth less as the result of Defendants' concealment of, and failure to remedy, the frame defect. Further, once the truth came out about the frame defect, the value of Grand Design RVs greatly decreased to well below the value the RVs would have had in the absence of the defect. This diminished value is directly attributable to Defendants' dishonesty and omissions with respect to the quality and safety of Grand Design RVs.

363.    Defendants' concealment of the frame defect was material to Plaintiffs and proposed class members.

364.    As a direct and proximate result of Defendants' violations of the Indiana DCSA, Plaintiffs and the proposed class members have suffered injury in fact and/or actual damages as alleged above. As a direct result of Defendants' misconduct, all Plaintiffs and proposed class members incurred damages in at least the form of lost time and money required to repair their RVs.

365.    Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff, including treble damages up to $1,000 for Defendants' willfully deceptive acts.

366.    Plaintiffs also seek punitive damages based on the outrageousness and recklessness of Defendants' conduct.

367.    On March 17, 2025, Plaintiffs sent a letter complying with Ind. Code § 24-5-0.5-5(a). Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs and the proposed class seek all damages and relief to which they are entitled.

## SECOND CAUSE OF ACTION

**Violation of the Minnesota Prevention of Consumer Fraud Act**
**Minn. Stat. § 325F.69 *et seq.***
**(On Behalf of Plaintiffs and the Nationwide Class, and the Minnesota Subclass)**

368.    Plaintiffs incorporate by reference all preceding allegations contained in this Complaint.

369.    This claim for relief is brought by Plaintiffs, individually on behalf of the Nationwide Class, against Defendants.

370.    In the alternative, this claim for relief is brought by Plaintiff Rieber against Defendants on behalf of the Minnesota Subclass.

371.    Grand Design RVs, as defined herein, constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

372.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69(1). Defendants engaged in misleading, false, or deceptive acts that violated the Minnesota CFA.

373.    By concealing the known defects in Plaintiffs' Grand Design RVs, Defendants engaged in deceptive business practices prohibited by the Minnesota CFA. Each Grand Design RV was manufactured with a defective frame, which caused customers' RV frames to fail or is likely to cause frame failure. Furthermore, the existence of this defect has significantly reduced the resale value of Grand Design RVs owned by Plaintiffs and the Class. The existence of the frame defect was concealed and would be material to a reasonable consumer.

374.    Defendants' actions, as set forth herein, occurred in the conduct of trade or commerce.

375.    In the course of their business, Defendants concealed defects in Plaintiffs' Grand Design RVs as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentation, or concealment, suppression or omission of any

material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and/or maintenance of Grand Design RVs.

376.    At all times relevant hereto, Defendants knew or should have known of the frame failure defect in Grand Design RVs because Defendants (i) designed the specifications for the Grand Design RV frames and knew or should have known that the frames were not capable of supporting the weight of the RV, (ii) received reports of actual frame failure at alarming rates, including through warranty claims, NHTSA complaints, and customer feedback, and (iii) took steps to actively conceal the alarming rate at which Grand Design RV frames were failing. Indeed, to this day, Defendants disparage reports of frame failure, calling it "rumor" or "misinformation."

377.    Instead of disclosing these frame defects, Defendants actively concealed them.

378.    Instead of disclosing these frame defects, Defendants continued marketing the RVs as safe, reliable, and fit-for-purpose.

379.    However, it is not possible to have a safe, reliable, fit-for-purpose RV if the frame—upon which the living quarters, walls, and weight of the vehicle rests—is not able to support that weight.

380.    Thus, Defendants actively concealed the fact that it was not possible to purchase a safe, reliable, or fit-for-purpose Grand Design RV.

381.    And this information and knowledge was not shared with customers. Rather, it remained within the sole possession, custody, and control of Defendants.

382.    By failing to disclose and by actively concealing the defects in Plaintiffs' Grand Design RVs, which were marketed as safe, reliable, and of high quality, Defendants engaged in unfair and deceptive business practices in violation of the Minnesota CFA.

383.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Plaintiffs' Grand Design RVs.

384.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their

RVs.

385.    Defendants intentionally and knowingly misrepresented material facts regarding Grand Design RVs with the intent to mislead Plaintiffs.

386.    Defendants knew or should have known that their conduct violated the Minnesota CFA.

387.    As alleged herein, Defendants made material statements about the safety and reliability of Grand Design RVs that were either false or misleading.

388.    Defendants owed Plaintiffs a duty to disclose the true safety and reliability of Grand Design RVs' frames because Defendants possessed exclusive knowledge about the frame defect; intentionally concealed the existence of the defect from Plaintiffs; and made incomplete representations about the safety and reliability of Grand Design RVs, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

389.    Because Defendants fraudulently concealed the frame defect in Grand Design RVs, Grand Design RV owners were deprived of the benefit of their bargain since the RVs they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs and Class members had to spend their time and money to attempt to repair RVs in which the frame failed. Had Grand Design RV owners been aware of the defects in their RVs, they would have either not bought the RV or would have paid less for it.

390.    Defendants' violations present a continuing risk to Plaintiffs as well as the general public. In particular and as alleged herein, Defendants have refused to recognize the frame failure defect, which poses significant risks to the safety of Grand Design RV owners and others on the road. Defendants' unlawful acts and practices complained of herein affect the public interest.

391.    As a direct and proximate result of Defendants' violations of the Minnesota CFA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.

392.    Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

393.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the

clear and convincing evidence that Defendants' acts show deliberate disregard for the rights and safety of others.

### THIRD CAUSE OF ACTION

**Violation of Minnesota Uniform Deceptive Trade Practices Act**
**Minn. Stat. § 325D.43-48, *et seq.***
**(On Behalf of Plaintiffs and the Nationwide Class, and the Minnesota Subclass)**

394.    Plaintiffs incorporate by reference all preceding allegations contained in this Complaint.

395.    This claim for relief is brought by Plaintiffs, individually and on behalf of the Nationwide Class, against Defendants.

396.    In the alternative, this claim for relief is brought by Plaintiff Rieber against Defendants on behalf of the Minnesota Subclass.

397.    The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur, *inter alia*, when a person "represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," or "represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," or "advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44.

398.    In the course of their business, Defendants systematically concealed the defects in Grand Design RVs and engaged in deceptive practices by representing that Grand Design RVs have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have; represented that Grand Design RVs are of a particular standard, quality, or grade, or that Grand Design RVs are of a particular style or model, when they were of another; and advertised Grand Design RVs with intent not to sell them as advertised.

399.    Defendants participated in misleading, false, or deceptive acts that violated the Minnesota DTPA. By concealing the known defects in Plaintiffs' Grand Design RVs, Defendants engaged in deceptive business practices prohibited by the Minnesota DTPA. The frame defect in each RV includes not only the specific defect, but also the defective process through which

Defendants built the RVs, a process that included minimizing the importance of safety and inspection, building faster at the cost of quality, and the failure to appropriately design and engineer parts to perform for their intended task. All of these defective processes would be material to a reasonable consumer.

400.    Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

401.    In the course of their business, Defendants concealed the frame defect in Grand Design RVs and otherwise engaged in activities with a tendency or capacity to deceive. Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Grand Design RVs.

402.    At all times relevant hereto, Defendants knew or should have known of the frame failure defect in Grand Design RVs because Defendants (i) designed the specifications for the Grand Design RV frames and knew or should have known that the frames were not capable of supporting the weight of the RV, (ii) received reports of actual frame failure at alarming rates, including through warranty claims, NHTSA complaints, and customer feedback, and (iii) took steps to actively conceal the alarming rate at which Grand Design RV frames were failing. Indeed, to this day, Defendants disparage reports of frame failure, calling it "rumor" or "misinformation.

403.    By failing to disclose and by actively concealing the frame defect in Grand Design RVs, which were marketed as safe, reliable, and of high quality, Defendants engaged in unfair and deceptive business practices in violation of the Minnesota DTPA.

404.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risk posed by the frame defect in Grand Design RVs.

405.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their

Grand Design RVs.

406.    Defendants intentionally and knowingly misrepresented material facts regarding Grand Design RVs with the intent to mislead Plaintiffs.

407.    Defendants knew or should have known that their conduct violated the Minnesota DTPA.

408.    As alleged herein, Defendants made material statements about the safety and reliability of Grand Design RVs that were either false or misleading.

409.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, Defendants have refused to recognize the frame failure defect, which poses significant risks to the safety of Grand Design RV owners and others on the road. Defendants' unlawful acts and practices complained of herein affect the public interest.

410.    As a direct and proximate result of Defendants' violations of the Minnesota DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.

411.    Pursuant to Minn. Stat. § 8.31(3a) and 325D.45, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

412.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

### FOURTH CAUSE OF ACTION

**Violation of the Arizona Consumer Fraud Act**
**Arizona Rev. Stat. § 44-1521 *et seq.***
**(Individually and On Behalf of the Arizona Subclass)**

413.    Plaintiffs incorporate by reference all preceding allegations contained in this Complaint.

414.    This claim for relief is brought by Plaintiff Auble, individually and on behalf of the Arizona Subclass, against Defendants.

415.    Defendants are "persons" within the meaning of the Arizona Consumer Fraud Act

66

("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

416.    The Grand Design RVs are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

417.    The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

418.    In the course of their business, Defendants systematically concealed the defects in Grand Design RVs and engaged in deceptive practices by representing that Grand Design RVs have characteristics, uses, or qualities that they do not have; and advertised Grand Design RVs with intent not to sell them as advertised.

419.    Defendants participated in misleading, false, or deceptive acts that violated the Arizona CFA. By concealing the known defects in Plaintiffs' Grand Design RVs, Defendants engaged in deceptive business practices prohibited by the Arizona CFA. The frame defect in each RV includes not only the specific defect, but also the defective process through which Defendants built the RVs, a process that included minimizing the importance of safety and inspection, building faster at the cost of quality, and the failure to appropriately design and engineer parts to perform for their intended task. All of these defective processes would be material to a reasonable consumer.

420.    Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

421.    In the course of their business, Defendants concealed the frame defect in Grand Design RVs and otherwise engaged in activities with a tendency or capacity to deceive. Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that

others rely upon such concealment, suppression or omission, in connection with the sale of Grand Design RVs.

422.    At all times relevant hereto, Defendants knew or should have known of the frame failure defect in Grand Design RVs because Defendants (i) designed the specifications for the Grand Design RV frames and knew or should have known that the frames were not capable of supporting the weight of the RV, (ii) received reports of actual frame failure at alarming rates, including through warranty claims, NHTSA complaints, and customer feedback, and (iii) took steps to actively conceal the alarming rate at which Grand Design RV frames were failing. Indeed, to this day, Defendants disparage reports of frame failure, calling it "rumor" or "misinformation.

423.    By failing to disclose and by actively concealing the frame defect in Grand Design RVs, which were marketed as safe, reliable, and of high quality, Defendants engaged in unfair and deceptive business practices in violation of the Arizona CFA.

424.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risk posed by the frame defect in Grand Design RVs.

425.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their Grand Design RVs.

426.    Defendants intentionally and knowingly misrepresented material facts regarding Grand Design RVs with the intent to mislead Plaintiffs.

427.    Defendants knew or should have known that their conduct violated the Arizona CFA.

428.    As alleged herein, Defendants made material statements about the safety and reliability of Grand Design RVs that were either false or misleading.

429.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, Defendants have refused to recognize the frame failure defect, which poses significant risks to the safety of Grand Design RV owners and others on the road. Defendants' unlawful acts and practices complained of herein affect the public

interest.

430.    Defendants' conduct, as described herein, deprived Plaintiff and the Arizona Subclass of the benefit of their bargain since the Grand Design RVs they purchased were worth less than they would have been if they were free from defects. Further, Plaintiffs and the Arizona Subclass had to spend time and money to deal with the hazard and inconvenience caused by the frame defect in their Grand Design RVs.

431.    As a direct and proximate result of Defendants' violations of the Arizona CFA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.

432.    Plaintiffs seek monetary relief against Defendants in an amount to be determined at trial. Plaintiffs also seek punitive damages because Defendants engaged in aggravated and outrageous conduct with an evil mind.

433.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## FIFTH CAUSE OF ACTION

**Violation of the California's False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500 *et seq.***
**(Individually and On Behalf of the California Subclass)**

434.    Plaintiffs incorporate by reference all preceding allegations contained in this Complaint.

435.    This claim for relief is brought by Plaintiffs Critchfield, Thompson, and Vanzyl (collectively "California Plaintiffs"), individually and on behalf of the California Subclass, against Defendants.

436.    Defendants' acts and practices, as described herein, have deceived and/or are likely to continue to deceive California Subclass members and the public. In the course of their business, Defendants systematically concealed the defects in Grand Design RVs and engaged in deceptive practices by representing that Grand Design RVs have characteristics, uses, or qualities that they do not have; and advertised Grand Design RVs with intent not to sell them as advertised.

437.    By its actions, Defendants disseminated uniform advertising and made uniform representations regarding Grand Design RVs to and across California. The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of California Business & Professions Code § 17500 *et seq.* Such advertisements were intended to and likely did deceive the consuming public for the reasons described herein.

438.    The above-described false, misleading, and deceptive advertising and representations Defendants disseminated continues to have a likelihood to deceive in that Defendants failed to disclose that the Grand Design RVs contain a defective frame that can and is likely to lead to frame failure.

439.    Defendants continue to misrepresent that the Grand Design RVs are free from frame defects. But that is not the case.

440.    In making and disseminating these statements and representations, Defendants knew, or should have known, their advertisements and statements were untrue and/or misleading in violation of California law. California Plaintiffs and other members of the California Subclass based their purchasing decisions on Defendants' misrepresentation and omission of material facts. California Plaintiffs and members of the California Subclass were injured in fact and lost money and property as a result.

441.    The misrepresentations and non-disclosures by Defendants of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of California Business & Professions Code § 17500 *et seq.*

442.    As a result of Defendants' wrongful conduct, California Plaintiffs and the California Subclass lost money in an amount to be proven at trial. California Plaintiffs and members of the California Subclass are therefore entitled to restitution as appropriate for this case of action.

443.    California Plaintiffs and members of the California Subclass seek all monetary and non-monetary relief permitted by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable

attorneys' fees and costs; injunctive relief; and other appropriate and equitable relief.

444.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price, and an injunction requiring (1) adequate disclosure of the frame defect; and (2) a recall of the affected RVs, will ensure that California Plaintiffs and members of the California Subclass are in the same place they would have been had Defendants' wrongful conduct not occurred, i.e., the position to make an informed decision about the purchase of an RV absent omissions and misrepresentations as described herein.

## SIXTH CAUSE OF ACTION

**Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(Individually and On Behalf of the California Subclass)**

445.    Plaintiffs incorporate by reference all preceding allegations contained in this Complaint.

446.    This claim for relief is brought by Plaintiffs Critchfield, Thompson, and Vanzyl (collectively "California Plaintiffs"), individually and on behalf of the California Subclass, against Defendants.

447.    California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice." For the reasons discussed herein, Defendants have engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

448.    By committing the acts and practices alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

449.    Defendants have violated the UCL's proscription against engaging in unlawful business practices because of their violations of California's Song-Beverly Act and California's False Advertising Law, in addition to violations of common law.

71

450.    As more fully described above, Defendants' misleading marketing and advertising of the Grand Design RVs is likely to deceive reasonable consumers. In addition, Defendants have committed unlawful business practices by, *inter alia*, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

451.    California Plaintiffs and members of the California Subclass reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

452.    Defendants have also violated the UCL's proscription against engaging in unfair business practices. Defendants' act, omissions, misrepresentations, practices and non-disclosures, as alleged herein, constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq.*, in that Defendants' conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

453.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

454.    Defendants have further violated the UCL's proscription against engaging in fraudulent business practices. Defendants' claims, nondisclosures, and misleading statements with respect to the Grand Design RVs were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

455.    California Plaintiffs and the members of the California Subclass suffered a substantial injury by virtue of purchasing the Grand Design RVs that they would not otherwise have purchased, or by paying more than they otherwise would have for those RVs, absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Grand Design RVs.

456.    There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Grand Design RVs.

457.    California Plaintiffs and other members of the California Subclass had no way of reasonably knowing that the Grand Design RVs they purchased were not as marketed and/or

advertised. Thus, they could not have reasonably avoided the injury each of them suffered.

458.    The gravity of the consequences of Defendants' conduct as described outweighs any justification, motive, or reason for engaging in this conduct, particularly considering the available legal alternatives which exist in the marketplace, and Defendants' conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and members of the California Subclass.

459.    Pursuant to California Business & Professions Code § 17203, California Plaintiffs and the California Subclass seek an order of this Court that includes, but is not limited to, requiring Defendants to (a) provide restitution to Plaintiff and the members of the California Subclass; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay attorney fees and costs.

### SEVENTH CAUSE OF ACTION

**Violation of Colorado Consumer Protection Act**
**CO Rev. Stat. § 6-1-101 *et seq.***
**(Individually and On Behalf of the Colorado Subclass)**

460.    Plaintiffs incorporate by reference all preceding allegations contained in this Complaint.

461.    This claim is brought by Plaintiff Reese, individually and on behalf of the Colorado Subclass, against Defendants.

462.    Defendants are "persons" as that term is defined in CO Rev. Stat § 6-1-102(6) § 1345.01(C).

463.    Plaintiff is a "consumer" as that term is used in CO Rev. Stat. § 6-1-105(1) and viewed "advertisements" as defined in CO Rev. Stat. § 6-1-102(1),

464.    Plaintiff's RV is both "property" and a "good," as the terms are defined and used, respectively, in CO Rev. Stat. § 6-1-102, and his purchase of a Grand Design RV was a "sale" within the meaning of CO Rev. Stat. § 6-1-102(10).

465.    The Colorado Consumer Protection Act ("CCPA"), CO Rev. Stat. § 6-1-105(1), broadly prohibits a person from engaging in a deceptive trade practice in the course of the person's

business, vocation, or occupation. Specifically, and without limitation of the broad prohibition, the CCPA prohibits persons from (i) representing that goods are of a particular standard, quality, or grade if they know or should know that they are of another; (ii) advertising goods, services, or property with intent not to sell them as advertised; and (iii) fails to disclose material information concerning goods or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction. Defendants' conduct as alleged herein constitutes unfair and/or deceptive consumer sales practices in violation of Colorado Rev. Stat. § 6-1-105.

466.    In the course of their business, Defendants systematically concealed the defects in Grand Design RVs and engaged in deceptive practices by representing that Grand Design RVs have characteristics, uses, or qualities that they do not have; and advertised Grand Design RVs with intent not to sell them as advertised.

467.    Defendants participated in misleading, false, or deceptive acts that violated the CCPA. By concealing the known defects in the Grand Design RVs, Defendants engaged in deceptive business practices prohibited by the CCPA. The frame defect in each RV includes not only the specific defect, but also the defective process through which Defendants built the RVs, a process that included minimizing the importance of safety and inspection, building faster at the cost of quality, and the failure to appropriately design and engineer parts to perform for their intended task. All of these defective processes would be material to a reasonable consumer.

468.    Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

469.    In the course of their business, Defendants concealed the frame defect in Grand Design RVs and otherwise engaged in activities with a tendency or capacity to deceive. Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Grand Design RVs.

470.    At all times relevant hereto, Defendants knew or should have known of the frame failure defect in Grand Design RVs because Defendants (i) designed the specifications for the Grand Design RV frames and knew or should have known that the frames were not capable of supporting the weight of the RV, (ii) received reports of actual frame failure at alarming rates, including through warranty claims, NHTSA complaints, and customer feedback, and (iii) took steps to actively conceal the alarming rate at which Grand Design RV frames were failing. Indeed, to this day, Defendants disparage reports of frame failure, calling it "rumor" or "misinformation.

471.    By failing to disclose and by actively concealing the frame defect in Grand Design RVs, which were marketed as safe, reliable, and of high quality, Defendants engaged in unfair and deceptive business practices in violation of the CCPA.

472.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risk posed by the frame defect in Grand Design RVs.

473.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their Grand Design RVs.

474.    Defendants intentionally and knowingly misrepresented material facts regarding Grand Design RVs with the intent to mislead Plaintiffs.

475.    Defendants knew or should have known that their conduct violated the CCPA.

476.    As alleged herein, Defendants made material statements about the safety and reliability of Grand Design RVs that were either false or misleading.

477.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, Defendants have refused to recognize the frame failure defect, which poses significant risks to the safety of Grand Design RV owners and others on the road. Defendants' unlawful acts and practices complained of herein affect the public interest.

478.    Defendants' conduct, as described herein, deprived Plaintiff and the Colorado Subclass of the benefit of their bargain since the Grand Design RVs they purchased were worth

less than they would have been if they were free from defects. Further, Plaintiff and the Colorado Subclass had to spend time and money to deal with the hazard and inconvenience caused by the frame defect in their Grand Design RVs.

479.    As a direct and proximate result of Defendants' violations of the CCPA, Plaintiff has suffered injury-in-fact and/or actual damage as alleged above.

480.    As a result of the foregoing wrongful conduct of Defendants, Plaintiff and members of the Colorado Subclass have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Defendants' deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees pursuant to CO Rev. Stat. § 6-1-101 *et seq*.

**EIGHTH CAUSE OF ACTION**

**Violation of Florida's Deceptive Trade Practices Act**
**Fla. Stat. § 501.201 *et seq*.**
**(Individually and On Behalf of the Florida Subclass)**

481.    Plaintiffs incorporate by reference all preceding allegations contained in this Complaint.

482.    This claim for relief is brought by Plaintiffs Daniel Peabody and Joseph Alterman ("Florida Plaintiffs"), individually and on behalf of the Florida Subclass, against Defendants.

483.    Florida Plaintiffs and members of the Florida Subclass are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

484.    Defendants engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

485.    The Florida Unfair & Deceptive Trade Practices Act ("FUDTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). By concealing that the Grand Design RVs were manufactured with defective frames, Defendants participated in unfair and deceptive trade practices that violated the FUDTPA as described herein. The fact that the

Grand Design RVs were manufactured with defective frames is material to a reasonable consumer.

486.    Defendants' actions, as set forth herein, occurred in the conduct of trade or commerce.

487.    In the course of their business, Defendants concealed the defective nature of the Grand Design RVs and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Grand Design RVs.

488.    Defendants knew or should have known that the Grand Design RVs were manufactured with defective frames, but concealed that information from consumers.

489.    By failing to disclose and by actively concealing the frame defect in the Grand Design RVs, which Defendants' marketed as safe, reliable, and of high quality, Defendants engaged in unfair and deceptive business practices in violation of the FUDTPA.

490.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Florida Plaintiffs and members of the Florida Subclass, about the true safety and reliability of their vehicles.

491.    Defendants owed Florida Plaintiffs and members of the Florida Subclass a duty to disclose the frame defect because Defendants (i) designed the specifications for the Grand Design RV frames and knew or should have known that the frames were not capable of supporting the weight of the RV, (ii) received reports of actual frame failure at alarming rates, including through warranty claims, NHTSA complaints, and customer feedback, and (iii) took steps to actively conceal the alarming rate at which Grand Design RV frames were failing. Indeed, to this day, Defendants disparage reports of frame failure, calling it "rumor" or "misinformation.

492.    Because Defendants unreasonably concealed the frame defect, Florida Plaintiffs and members of the Florida Subclass were deprived of the benefit of their bargain since the Grand Design RVs they purchased were worth less than they would have been if free from defects. Had

Florida Plaintiffs and members of the Florida Subclass been aware that the frame defect was present in the Grand Design RVs, they would have either not bought the RVs or would have paid less for them.

493.    As a direct and proximate result of Defendants' violations of the FUDTPA, Florida Plaintiffs and members of the Florida Subclass have suffered injury-in-fact and/or actual damage as alleged above.

494.    Florida Plaintiffs and members of the Florida Subclass are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

495.    Florida Plaintiffs and members of the Florida Subclass also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

### NINTH CAUSE OF ACTION

**Violation of the Georgia Fair Business Practices Act**
**G. Code §§ 10-1-390 through 10-1-407**
**(Individually and On Behalf of the Georgia Subclass)**

496.    Plaintiffs incorporate by reference all preceding allegations contained in this Complaint.

497.    This claim for relief is brought by Plaintiffs Andrew and Lucy Hallberg ("Georgia Plaintiffs"), individually and on behalf of the Georgia Subclass, against Defendants.

498.    Georgia Plaintiffs and members of the Georgia Subclass are "consumers" within the meaning of the Georgia Fair Business Practices Act ("GFBPA"), Ga. Code § 10-1-392(a)(6).

499.    Defendants are "persons" within the meaning of Ga. Code § 10-1-392(a)(24), and they engaged in "consumer acts or practices" and "consumer transactions" within the meaning of Ga. Code § 10-1-392(a)(7) and (a)(10) by marketing and selling RVs to Plaintiffs and the Georgia Subclass.

500.    The GFBPA is intended "to protect consumers" from "unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or

commerce." Ga. Code §§ 10-1-391; 10-1-393(a). This includes, but is not limited to, (i) representing that goods or services have characteristics, uses, or benefits that they do not have; (ii) representing that goods or services are of a particular standard, quality, or grade if they are of another; and (iii) advertising goods or services with the intent not to sell them as advertised. *See* Ga. Code § 10-1-393(b). Moreover, a person commits an "intentional violation" when the "person committing the act or practice knew that his or her conduct was in violation" of the GFBPA. Ga. Code § 10-1-392(b).

501.    By concealing that the Grand Design RVs were manufactured with defective frames, Defendants intentionally violated the GFBPA as described herein. The fact that the Grand Design RVs were manufactured with defective frames is material to a reasonable consumer.

502.    In the course of their business, Defendants concealed the defective nature of the Grand Design RVs and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful consumer transactions by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Grand Design RVs.

503.    Defendants knew or should have known that the Grand Design RVs were manufactured with defective frames but concealed that information from consumers.

504.    By failing to disclose and by actively concealing the frame defect in the Grand Design RVs, which Defendants' marketed as safe, reliable, durable, and of high quality, Defendants engaged in unfair and violative consumer acts or practices in violation of the GFBPA.

505.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Georgia Plaintiffs and members of the Georgia Subclass, about the true safety, reliability, durability, and quality of their RVs.

506.    Defendants owed Georgia Plaintiffs and members of the Georgia Subclass a duty to disclose the frame defect because Defendants (i) designed the specifications for the Grand Design RV frames and knew or should have known that the frames were not capable of supporting

the weight of the RV, (ii) received increased reports of actual frame failure at statistically significant rates, including through warranty claims, NHTSA complaints, and customer feedback, and (iii) took steps to actively conceal the alarming rate at which Grand Design RV frames were failing. Indeed, to this day, Defendants disparage reports of frame failure, calling it "rumor" or "misinformation.

507.    Because Defendants unreasonably concealed the frame defect, Georgia Plaintiffs and members of the Florida Subclass were deprived of the benefit of their bargain since the Grand Design RVs they purchased were worth less than they would have been if free from defects. Had Georgia Plaintiffs and members of the Georgia Subclass been aware that the frame defect was present in the Grand Design RVs, they would have either not bought the RVs or would have paid less for them.

508.    As a direct and proximate result of Defendants' violations of the GFBPA, Georgia Plaintiffs and members of the Georgia Subclass have suffered injury-in-fact and/or actual damage as alleged above.

509.    Georgia Plaintiffs and members of the Georgia Subclass are entitled to recover pursuant to GA Code § 10-1-399 (a)-(d).

510.    Georgia Plaintiffs and members of the Georgia Subclass also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the GFBPA.

## TENTH CAUSE OF ACTION

**Violation of the Illinois Consumer Fraud and
Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* and 720 ILCS 295/1A
(Individually and On Behalf of the Illinois Subclass)**

511.    Plaintiffs incorporate by reference all preceding allegations contained in this Complaint.

512.    This claim for relief is brought by Plaintiff Pfeiffer, individually and on behalf of the Illinois Subclass, against Defendants.

513.    Defendants are "persons" as that term is defined in 815 ILCS 505/1(c).

514.    Plaintiff and members of the Illinois Subclass are "consumers" as that term is defined in 815 ILCS 505/1(e).

515.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

516.    Defendants participated in misleading, false, or deceptive acts that violated the Illinois CFA. By concealing known defects in the Grand Design RV frames, Defendants engaged in deceptive business practices prohibited by the Illinois CFA. The defects in the Grand Design RVs include not only the defective frames, but also include the defective process through which Defendants manufactured and designed the Grand Design RVs, a process that included the failure to design frames that were fit for purpose.

517.    Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

518.    Since at least 2020, Defendants knew that the frames installed in Grand Design RVs were not fit for their intended purpose and could not reasonably support the weight of the RV.

519.    By failing to disclose and by actively concealing the defects in the Grand Design RVs owned by Plaintiff and the Illinois Class, which Defendants marketed as safe, reliable, and of high quality, Defendants engaged in unfair and deceptive business practices in violation of the

Illinois CFA.

520. In the course of Defendants' business, it willfully failed to disclose and actively concealed the frame defect and the risks of frame failure in Grand Design RVs.

521. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of their Grand Design RVs.

522. Defendants intentionally and knowingly misrepresented material facts regarding the Grand Design RVs with the intent to mislead Plaintiff and Illinois Subclass members.

523. Defendants made efforts to conceal the frame defect in Grand Design RVs, refusing to repair customers' frames unless those customers signed non-disclosure agreements committing themselves to silence.

524. Defendants knew or should have known that their conduct violated the Illinois CFA.

525. Defendants owed Plaintiff and the Illinois Subclass a duty to disclose the true safety and reliability of the Grand Design RVs because they (i) possessed exclusive knowledge about the frame defects in the Grand Design RVs, (ii) intentionally concealed the existence of the frame defect from Plaintiff and their customers, and (iii) made incomplete representations about the safety and reliability of the Grand Design RVs, while purposefully withholding material facts from Plaintiff that contradicted these representations.

526. Because Defendants concealed the defects in the Grand Design RVs, Grand Design RV owners were deprived of the benefit of their bargain since the RVs they purchased were worth less than they would have been if they were free from defects. Further, Plaintiff and members of the Illinois Subclass were forced to spend their time and money attempting to repair their defective

frames and dealing with issues related to frame failure. Had Plaintiff and members of the Illinois Subclass been aware of the defects in their RVs, they would have either not bought the RVs or would have paid less for them.

527.    Plaintiff and members of the Illinois Subclass were also harmed by Defendants' unfair and deceptive trade practices since their Grand Design RVs were worth less as the result of Defendants' failure to disclose, and failure to remedy, the frame defects. Once the existence of this defect was disclosed, the value of Grand Design RVs greatly decreased. This diminished value is directly attributable to Defendants' concealment and omissions with respect to the quality and safety of the Grand Design RVs.

528.    Defendants' concealment of the frame defect in Grand Design RVs was material to Plaintiff and the Illinois Subclass.

529.    Pursuant to 815 ILCS 505/10a(a), Plaintiff seeks monetary relief against Defendants in the amount of actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or were grossly negligent.

530.    Plaintiff also seeks an order enjoining Defendants' unfair and/or deceptive acts and compelling a recall, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq*.

## ELEVENTH CAUSE OF ACTION

**Violation of New Hampshire Consumer Protection Act**
**N.H. Rev. Stat. Ann. § 358-A:1, *et seq*.**
**(Individually and On Behalf of the New Hampshire Subclass)**

531.    Plaintiffs incorporate by reference all preceding allegations contained in this Complaint.

532.    This claim is brought by Plaintiff Croteau, individually and on behalf of the New Hampshire Subclass, against Defendants.

533.    Plaintiff and Defendants are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. Rev. Stat. § 358-A:1.

534.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

535.    The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but . . . not limited to, the following: . . . (V) Representing that goods or services have . . . characteristics, . . . uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade, . . . if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. Rev. Stat. § 358-A:2.

536.    In the course of their business, Defendants systematically concealed the defects in Grand Design RVs and engaged in deceptive practices by representing that Grand Design RVs have characteristics, uses, or qualities that they do not have; and advertised Grand Design RVs with intent not to sell them as advertised.

537.    Defendants participated in misleading, false, or deceptive acts that violated the New Hampshire CPA. By concealing the known defects in Plaintiffs' Grand Design RVs, Defendants engaged in deceptive business practices prohibited by the New Hampshire CPA. The frame defect in each RV includes not only the specific defect, but also the defective process through which Defendants built the RVs, a process that included minimizing the importance of safety and inspection, building faster at the cost of quality, and the failure to appropriately design and engineer parts to perform for their intended task. All of these defective processes would be material to a reasonable consumer.

538.    Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

539.    In the course of their business, Defendants concealed the frame defect in Grand

Design RVs and otherwise engaged in activities with a tendency or capacity to deceive. Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Grand Design RVs.

540.    At all times relevant hereto, Defendants knew or should have known of the frame failure defect in Grand Design RVs because Defendants (i) designed the specifications for the Grand Design RV frames and knew or should have known that the frames were not capable of supporting the weight of the RV, (ii) received reports of actual frame failure at alarming rates, including through warranty claims, NHTSA complaints, and customer feedback, and (iii) took steps to actively conceal the alarming rate at which Grand Design RV frames were failing. Indeed, to this day, Defendants disparage reports of frame failure, calling it "rumor" or "misinformation."

541.    By failing to disclose and by actively concealing the frame defect in Grand Design RVs, which were marketed as safe, reliable, and of high quality, Defendants engaged in unfair and deceptive business practices in violation of the New Hampshire CPA.

542.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risk posed by the frame defect in Grand Design RVs.

543.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their Grand Design RVs.

544.    Defendants intentionally and knowingly misrepresented material facts regarding Grand Design RVs with the intent to mislead Plaintiffs.

545.    Defendants knew or should have known that their conduct violated the New Hampshire CPA.

546.    As alleged herein, Defendants made material statements about the safety and reliability of Grand Design RVs that were either false or misleading.

547.    Defendants' violations present a continuing risk to Plaintiffs as well as to the

general public. In particular and as alleged herein, Defendants have refused to recognize the frame failure defect, which poses significant risks to the safety of Grand Design RV owners and others on the road. Defendants' unlawful acts and practices complained of herein affect the public interest.

548.    Defendants' conduct, as described herein, deprived Plaintiff and the New Hampshire Subclass of the benefit of their bargain since the Grand Design RVs they purchased were worth less than they would have been if they were free from defects. Further, Plaintiff and the New Hampshire Subclass had to spend time and money to deal with the hazard and inconvenience caused by the frame defect in their Grand Design RVs.

549.    As a direct and proximate result of Defendants' violations of the New Hampshire CPA, Plaintiff have suffered injury-in-fact and/or actual damage as alleged above.

550.    Because Defendants' willful conduct caused injury to Plaintiff's property through violations of the New Hampshire CPA, Plaintiff and the New Hampshire Subclass seek recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, an order enjoining Defendants' unfair and/or deceptive acts and practices, and any other just and proper relief under N.H. Rev. Stat. § 358-A:10.

**TWELFTH CAUSE OF ACTION**

**Violation of Ohio Consumer Sales Practices Act**
**Ohio Rev. Code Ann. §§ 1345.01 *et seq.***
**(Individually and On Behalf of the Ohio Subclass)**

551.    Plaintiffs incorporate by reference all preceding allegations contained in this Complaint.

552.    This claim is brought by Plaintiff O'Neal, individually and on behalf of the Ohio Subclass, against Defendants.

553.    Defendants are "suppliers" as that term is defined in Ohio Rev. Code § 1345.01(C).

554.    Plaintiff is a "consumer" as that term is defined in Ohio Rev. Code § 1345.01(D), and his purchase of a Grand Design RV is a "consumer transaction" within the meaning of Ohio

Rev. Code § 1345.01(A).

555.    The Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code §
1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer
transaction. Specifically, and without limitation of the broad prohibition, the Act prohibits
suppliers from representing (i) that goods have characteristics or uses or benefits which they do
not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) the subject
of a consumer transaction has been supplied in accordance with a previous representation, if it has
not. Defendants' conduct as alleged herein constitutes unfair and/or deceptive consumer sales
practices in violation of Ohio Rev. Code § 1345.02.

556.    In the course of their business, Defendants systematically concealed the defects in
Grand Design RVs and engaged in deceptive practices by representing that Grand Design RVs
have characteristics, uses, or qualities that they do not have; and advertised Grand Design RVs
with intent not to sell them as advertised.

557.    Defendants participated in misleading, false, or deceptive acts that violated the
Ohio CSPA. By concealing the known defects in the Grand Design RVs, Defendants engaged in
deceptive business practices prohibited by the Ohio CSPA. The frame defect in each RV includes
not only the specific defect, but also the defective process through which Defendants built the RVs,
a process that included minimizing the importance of safety and inspection, building faster at the
cost of quality, and the failure to appropriately design and engineer parts to perform for their
intended task. All of these defective processes would be material to a reasonable consumer.

558.    Defendants' actions, as set forth above, occurred in the conduct of trade or
commerce.

559.    In the course of their business, Defendants concealed the frame defect in Grand
Design RVs and otherwise engaged in activities with a tendency or capacity to deceive. Defendants
engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud,
misrepresentations, or concealment, suppression or omission of any material fact with intent that
others rely upon such concealment, suppression or omission, in connection with the sale of Grand

Design RVs.

560.    At all times relevant hereto, Defendants knew or should have known of the frame failure defect in Grand Design RVs because Defendants (i) designed the specifications for the Grand Design RV frames and knew or should have known that the frames were not capable of supporting the weight of the RV, (ii) received reports of actual frame failure at alarming rates, including through warranty claims, NHTSA complaints, and customer feedback, and (iii) took steps to actively conceal the alarming rate at which Grand Design RV frames were failing. Indeed, to this day, Defendants disparage reports of frame failure, calling it "rumor" or "misinformation."

561.    By failing to disclose and by actively concealing the frame defect in Grand Design RVs, which were marketed as safe, reliable, and of high quality, Defendants engaged in unfair and deceptive business practices in violation of the Ohio CSPA.

562.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risk posed by the frame defect in Grand Design RVs.

563.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their Grand Design RVs.

564.    Defendants intentionally and knowingly misrepresented material facts regarding Grand Design RVs with the intent to mislead Plaintiffs.

565.    Defendants knew or should have known that their conduct violated the Ohio CSPA.

566.    As alleged herein, Defendants made material statements about the safety and reliability of Grand Design RVs that were either false or misleading.

567.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, Defendants have refused to recognize the frame failure defect, which poses significant risks to the safety of Grand Design RV owners and others on the road. Defendants' unlawful acts and practices complained of herein affect the public interest.

568.    Defendants' conduct, as described herein, deprived Plaintiff and the Ohio Subclass

of the benefit of their bargain since the Grand Design RVs they purchased were worth less than they would have been if they were free from defects. Further, Plaintiff and the Ohio Subclass had to spend time and money to deal with the hazard and inconvenience caused by the frame defect in their Grand Design RVs.

569.    As a direct and proximate result of Defendants' violations of the Ohio CSPA, Plaintiff have suffered injury-in-fact and/or actual damage as alleged above.

570.    As a result of the foregoing wrongful conduct of Defendants, Plaintiff and members of the Ohio Subclass have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Defendants' deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees pursuant to Ohio Rev. Code § 1345.09 *et seq.*

## THIRTEENTH CAUSE OF ACTION

### Violation of Oregon Unlaw Trade Practices Act
### Or. Rev. Stat. §§ 646.605 *et seq.*
### (Individually and On Behalf of the Oregon Subclass)

571.    Plaintiffs incorporate by reference all preceding allegations in this Complaint.

572.    This claim is brought by Plaintiff Don Bilyeu, individually and on behalf of the Colorado Subclass, against Defendants.

573.    Defendants are "persons" as that term is defined in OR Rev. Stat. § 646.605(4), and their marketing and sale of RVs to Plaintiff and members of the Oregon Subclass constitutes "trade" or "commerce" of "Real estate, goods, or services" as those terms are defined in OR Rev. Stat. § 646.605(6)(a) and (8).

574.    The Oregon Unlawful Trade Practices Act ("OUTPA"), OR Rev. Stat. § 646.608, broadly prohibits any person from engaging in an "unlawful trade practice" in "the course of the person's business, vocation, or occupation," including: (i) representing that goods have sponsorship, approval, characteristics, uses, benefits, or qualities that they do not have; (ii) representing that goods are of a particular standard, quality, or grade; and (iii) engaging in any other unfair or deceptive conduct in trade or commerce. Defendants' misrepresentations about the

characteristics, quality, standard, and/or grade of their RVs, as alleged herein, constitute unfair and/or deceptive consumer sales practices in violation of OR Rev. Stat. § 646.608. A willful violation occurs when the person committing the violation "knew or should have known that the conduct of the person was a violation." OR Rev. Stat. § 646.605(10)

575.    In the course of their business, Defendants committed willful violations of OUTPA by systematically concealing the defects in Grand Design RVs and by representing that Grand Design RVs had characteristics, qualities, uses, standards, and/or grade that they do not have. Thus, Defendants should have known that they were advertised Grand Design RVs with the intent not to sell them as advertised.

576.    Defendants willfully participated in misleading, false, or deceptive acts that violated the OUTPA. By concealing the known defects in the Grand Design RVs, Defendants engaged in deceptive business practices prohibited by the OUTPA. The frame defect in each RV includes not only the specific defect, but also the defective process through which Defendants built the RVs, a process that included minimizing the importance of safety and inspection, building faster at the cost of quality, and the failure to appropriately design and engineer parts to perform for their intended task. All of these defective processes would be material to a reasonable consumer.

577.    Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

578.    In the course of their business, Defendants concealed the frame defect in Grand Design RVs and otherwise engaged in activities with a tendency or capacity to deceive. Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Grand Design RVs. These unlawful trade practices mislead Plaintiff and members of the Oregon Subclass.

579.    At all times relevant hereto, Defendants knew or should have known of the frame

failure defect in Grand Design RVs because Defendants (i) designed the specifications for the Grand Design RV frames and knew or should have known that the frames were not capable of supporting the weight of the RV, (ii) received reports of actual frame failure at alarming rates, including through warranty claims, NHTSA complaints, and customer feedback, and (iii) took steps to actively conceal the alarming rate at which Grand Design RV frames were failing. Indeed, to this day, Defendants disparage reports of frame failure, calling it "rumor" or "misinformation."

580.    By failing to disclose and by actively concealing the frame defect in Grand Design RVs, which were marketed as safe, reliable, and of high quality, Defendants engaged in unfair and deceptive business practices in violation of the OUTPA.

581.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risk posed by the frame defect in Grand Design RVs.

582.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their Grand Design RVs.

583.    Defendants intentionally and knowingly misrepresented material facts regarding Grand Design RVs with the intent to mislead Plaintiffs.

584.    Defendants knew or should have known that their conduct violated the OUTPA.

585.    As alleged herein, Defendants made material statements about the safety and reliability of Grand Design RVs that were either false or misleading.

586.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, Defendants have refused to recognize the frame failure defect, which poses significant risks to the safety of Grand Design RV owners and others on the road. Defendants' unlawful acts and practices complained of herein affect the public interest.

587.    Defendants' conduct, as described herein, deprived Plaintiff and the Oregon Subclass of the benefit of their bargain since the Grand Design RVs they purchased were worth less than they would have been if they were free from defects. Further, Plaintiff and the Oregon

Subclass had to spend time and money to deal with the hazard and inconvenience caused by the frame defect in their Grand Design RVs.

588.    As a direct and proximate result of Defendants' violations of the OUTPA, Plaintiff has suffered injury-in-fact and/or actual damage as alleged above.

589.    As a result of the foregoing wrongful conduct of Defendants, Plaintiff and members of the OUTPA Subclass have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and punitive damages, an order enjoining Defendants' deceptive and unfair conduct, court costs, and reasonable attorneys' fees.

### FOURTEENTH CAUSE OF ACTION

**Negligence**
**(On Behalf of Plaintiffs and the Nationwide Class**
**or, in the Alternative, Individual Statewide Classes)**

590.    Plaintiffs incorporate by reference all preceding allegations contained in this Complaint.

591.    This claim is brought by Plaintiffs against Defendants under Indiana law on behalf of the Nationwide Class or, in the alternative, on behalf of the statewide classes.

592.    Under Indiana, Arizona, California, Colorado, Florida, Georgia, Illinois, Minnesota, New Hampshire, Ohio, and Oregon, Defendants undertook a duty of care when they provided customers with Grand Design RVs that they advertised as safe and of high quality.

593.    This duty included, at minimum, a responsibility not to sell customers RVs that were manufactured with defective frames.

594.    Defendants breached their duty to Plaintiffs and members of the Classes by selling defective Grand Design RVs that contained a faulty frame.

595.    Defendants' breach of their duty caused harm to Plaintiffs and members of the Classes, who unwittingly purchased defective RVs that were worth less than an RV that was free from defects. Moreover, these undisclosed defects caused harm to Plaintiffs' personal property and fixtures, resulted in out-of-pocket losses for Plaintiffs, and caused substantial emotional

distress.

596.    As a result of Defendants' misconduct, as alleged herein, Plaintiffs and members of the Classes have been injured and seek damages in an amount to be proven at trial.

### FIFTEENTH CAUSE OF ACTION

**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class**
**or, in the Alternative, Individual Statewide Classes)**

597.    Plaintiffs incorporate by reference all preceding allegations contained in this Complaint.

598.    This claim is brought on behalf of the Nationwide Class under Indiana law or, in the alternative, as statewide classes under the laws of Arizona, California, Colorado, Florida, Georgia, Illinois, Minnesota, New Hampshire, Ohio, and Oregon.

599.    As the intended and expected result of their conscious wrongdoing alleged herein, Defendants have profited and benefited from Plaintiffs' and Class members' purchases of Grand Design RVs. Plaintiffs' and Class members' payments for Grand Design RVs flowed to Defendants.

600.    Defendants voluntarily accepted and retained these profits and benefits derived from Plaintiffs and the Class, with full knowledge and awareness that, as a result of their misconduct, Plaintiffs and the Class were not receiving products of the quality, nature, fitness, or value that had been represented by Defendants and that Plaintiffs and the Class, as reasonable consumers, expected for an RV that was manufactured with defective frames.

601.    If Plaintiffs and Class members knew Grand Design RVs were manufactured with defective frames as alleged herein, they would not have purchased Grand Design RVs.

602.    Defendants have been unjustly enriched by their fraudulent and deceptive withholding of benefits to their customers at the expense of Plaintiffs and the Class.

603.    Defendants profited from Plaintiffs' purchases and used Plaintiffs and Class members' monetary payments for business purposes. Defendants' retention of these profits and benefits is inequitable and against good conscience. Principles of equity and good conscience

preclude Defendants from retaining these profits and benefits.

604.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and the Class suffered injury and seek the disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, plus interest, to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a) Certify the Class with Plaintiffs appointed as Class representatives and the undersigned appointed as Class counsel;

b) Enter a judgment declaring that Defendants engaged in the unlawful conduct as alleged herein;

c) Award actual, compensatory, statutory, and consequential damages, along with punitive, treble or other multiple damages;

d) Award equitable monetary relief, including restitution and disgorgement of all ill-gotten profits from the sale of Grand Design RVs;

e) Enter an injunction requiring Defendants to buy back all Grand Design RVs owned by the Class, and prohibiting Defendants from continuing to engage in the unlawful conduct as alleged herein;

f) Award Plaintiffs the costs of this action, including reasonable attorneys' fees and expenses and expert fees, as allowed by law;

g) Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

h) Award such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: June 23, 2025                Respectfully submitted,


                                    /s/ Lynn A. Toops
                                    Lynn A. Toops
                                    **COHENMALAD, LLP**
                                    One Indiana Sq. Ste 1400
                                    Indianapolis, IN 46204
                                    Phone: (317) 636-6481
                                    ltoops@cohenmalad.com

                                    James Bilsborrow*
                                    Aaron Freedman*
                                    Emma Dietz*
                                    **WEITZ & LUXENBERG, PC**
                                    700 Broadway
                                    New York, NY 10003
                                    Phone: (212) 558-5500
                                    jbilsborrow@weitzlux.com
                                    afreedman@weitzlux.com
                                    edietz@weitzlux.com

                                    *to seek admission *pro hac vice*

                                    *Attorneys for Plaintiffs*